Case No. 2022-1468

United States Court of Appeals
for the Federal Circuit

---

**RIGGS TECHNOLOGY HOLDINGS, LLC.,**
Plaintiff-Appellant

v.

**CENGAGE LEARNING, INC.,**
Defendants-Appellees

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS IN Civil Action No. 1:21-CV-10778, Honorable Judge Leo T. Sorokin

---

BRIEF OF PLAINTIFF-APPELLANT
RIGGS TECHNOLOGY HOLDINGS, LLC.

Attorneys for Appellants:

Ramey LLP

/s/ William P. Ramey, III
William P. Ramey, III
Texas Bar No. 24027643
wramey@rameyfirm.com
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
(713) 426-3923
(832) 900-4941 (fax)

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4(a) and Federal Rule of Appellate Procedure 26.1, counsel for Appellant RIGGS TECHNOLOGY HOLDINGS, LLC ("Riggs") certifies the following:

1. The full name of every party represented by the undersigned is Riggs Technology Holdings, LLC of 6605 Uptown Blvd NE, Suite 240, Albuquerque, NM 87110.

2. The real party in interest is Riggs Technology Holdings, LLC.

3. Riggs Technology Holdings, LLC has no parent corporation and there is no publicly held corporation that owns 10% or more of the stock of either corporation.

4. The names of all law firms and the partners or associates that appeared for Riggs Technology Holdings, LLC in the district court or are expected to appear in this Court are:

William P. Ramey, III
Ramey LLP

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. See Fed. Cir. R. 47. 4(a)(5) and 47.5(b).

*Riggs Technology Holdings, LLC v. Vagaro Inc.,*
U.S.D.C., S.D.CA – No: 3:21-CV-07927 (TSH) and
Case No. 2022-1469 Appeal pending before this Court

*Riggs Technology Holdings, LLC v. Baker Communications, Inc.*
U.S.D.C., S.D.TX – No: 4:21-CV-00378 (SL)

*Riggs Technology Holdings, LLC v. Relias Learning, LLC.*
U.S.D.C., S.D.N.Y. – No: 1:21-CV-06229 (PGG)

Date: April 12, 2022

/s/ William P. Ramey, III
William P. Ramey, III

## TABLE OF CONTENTS


STATEMENT OF RELATED CASES ..... 1

STATEMENT OF JURISDICTION ..... 1

ISSUES PRESENTED ..... 2

STATEMENT OF THE CASE ..... 2

STATEMENT OF RELEVANT FACTS ..... 3

SUMMARY OF ARGUMENT ..... 5

STANDARDS OF REVIEW ..... 9

ARGUMENT ..... 9

I. THE DISTRICT COURT ERRED IN FINDING THE CLAIMS PATENT INELIGIBLE ..... 9
   - A. The District Court Erred in Determining the Focus of the Claims for Patent Eligibility Determination ..... 9

II. THE DISTRICT COURT'S IMPROPER SUMMARY OF THE CLAIMS MISSED THE FOCUS OF THE CLAIMS ..... 12
   - A. The Claims are Focused On Communicating Training Data Between a Handheld Device and a Server Wirelessly, Anywhere, Anytime ..... 12
   - B. The Claimed Invention is an Improvement in Handheld, Wireless Communication. ..... 17

III. THE DISTRICT COURT FURTHER ERRED BY NOT CONSIDERING THE OTHER INVENTIVE ASPECTS OF THE CLAIMED INVENTIONS ..... 19
   - A. The District Court's Order ..... 22
   - B. Factual Assertions in the '067 Patent that the District Court did not Consider ..... 24

CONCLUSION AND RELIEF SOUGHT ..... 25

## TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018) .......... 21, 24

*Alice Corp. v. CLS Bank, Int'l*, 573 U.S, 208, 134 S. Ct. 2347 (2014) .... 10, 12, 18, 19

*Amdocs (Israel), Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 120 USPQ2d 1527 (Fed. Cir. 2016) .......... 18

*Ariosa Diagnostics, Inc. v. Sequenom, Inc., 788 F.3d 1371 (Fed. Cir. 2015)* .......... 13

*BASCOM Glob. Internet Servs., Inc. v. AT & T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016) .......... 10, 11

*Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018) .......... 8, 9, 20, 21

*BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281 (Fed. Cir. 2018) .......... 8, 19

*ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759 (Fed. Cir. 2019) .......... 13, 19

*DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245 (Fed. Cir. 2014)* .......... 23

*Diamond v. Diehr*, 450 U.S. 175, 189 n.12 (1981) .......... 11

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) .......... 10, 11, 17

*Eyetalk365 v. Zmodo Tech. Corp.*, No. 2:17- cv-02714-RCJ-PAL, 2018 U.S. Dist. LEXIS 23929 (D. Nev. Feb. 14, 2018) .......... 10, 12

*In re TLI Commc'ns*, 823 F.3d at 612 .......... 13

*McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 120 USPQ2d 1091 (Fed. Cir. 2016) .......... 7, 17

*Messaging Gateway Sols., LLC v. Amdocs, Inc.*, Civil Action No. 14-732-RGA, 2015 U.S. Dist. LEXIS 49408 (D. Del. Apr. 15, 2015) .......... 22

*Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91 (2011) .......... 19

*SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161 (Fed. Cir. 2018) .......... 7, 16, 20

*SRI Int'l, Inc. v. Cisco Sys.*, 918 F.3d 1368 (Fed. Cir. 2019) .......... 7, 18

*Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084 (Fed. Cir. 2019) ....... 5, 9, 12, 19

*W.L. Gore & Associates, Inc., v. Garlock, Inc.* F.2d 1540 (Fed.Cir. 1983) .................20

# TABLE OF ABBREVIATIONS

***Parties***

| | |
|---|---|
| Plaintiff | Riggs Technology Holdings, LLC |
| Defendants | Cengage Learning, Inc. |

***Patents-in-Suit***

| | |
|---|---|
| The '067 patent | U.S. Patent 7,299,067 |

***Defined Terms***

| | |
|---|---|
| District Court | United States District Court for the District of Massachusetts, the Honorable Judge Leo T. Sorokin |
| Court of Appeals | United States Court of Appeals for the Federal Circuit |

All emphasis in this brief is added unless otherwise indicate.

## STATEMENT OF RELATED CASES

No appeal in or from this civil action has previously been before an appellate court. There are five district court actions with allegations of infringement of the claims of the '067 patent, *Riggs Technology Holdings, LLC v Vagaro Inc*., U.S.D.C., S.D.CA – No: 3:21-CV-07927 (TSH) and Case No. 2022-1469 Appeal pending before this Court; *Riggs Technology Holdings, LLC v Baker Communications, Inc*. U.S.D.C., S.D.TX – No: 4:21-CV-00378 (SL); *Riggs Technology Holdings, LLC v Relias Learning, LLC.*, U.S.D.C., S.D.N.Y. – No: 1:21-CV-06229 (PGG). On January 7, 2022, the district court in the Northern District of California entered an Order dismissing the claims in the *Vagaro* case. On January 21, 2022, the district court in the District of Massachusetts entered an Order dismissing the claims in the *Cengage* case.

## STATEMENT OF JURISDICTION

For this patent action, the District Court has jurisdiction per 28 U.S.C. §§ 1331, 1338(a), and 1367 and this Court has appellate jurisdiction per 28 U.S.C. § 1295. This appeal is from a final judgment that disposes of all parties' claims. The Final Judgment was signed on January 21, 2022 and dismissed the entire action.[1] On February 8, 2022, Appellant filed a Notice of Appeal.[2]

---

[1] Appx0001.
[2] Appx0150-0151.

## ISSUES PRESENTED

- Did the District Court err in determining that the claims of U.S. Patent 7,299,067 were directed to patent ineligible subject matter by incorrectly determining the focus of the claims? Would a proper determination of the novel features of the claims as identified during examination by the United States Patent Office aid in determining patent eligibility?
- Did the District Court err in not considering the other inventive aspects of the claimed inventions when determining that the claims of U.S. Patent 7,299,067 are directed to patent ineligible subject matter?
- Did the District Court err by not recognizing that the claims of U.S. Patent 7,299,067 solve a technological problem of how to allow users to access and document training wirelessly via handheld device?
- Did the District Court erroneously apply hindsight in finding that the claim elements wireless and hand held device were conventional?

## STATEMENT OF THE CASE

This is a patent case involving issues of patent eligibility of the claims of the '067 patent. The District Court determined the Claims of the '067 patent are directed to patent ineligible subject matter. A Final Judgment was signed on

January 21, 2022 and dismissed the entire action.[3] On February 8, 2022, Appellant filed a Notice of Appeal.[4]

## STATEMENT OF RELEVANT FACTS

On November 20, 2007, U.S. Patent No. 7,299,067 entitled "Methods and Systems for Managing the Provision of Training Provided Remotely Through Electronic Data Networks to Users of Remote Electronic Devices" was duly and legally issued by the U.S. Patent and Trademark Office. The priority date for each claim is October 12, 2001.[5] Riggs owns the '067 patent by assignment. The '067 patent relates to novel and improved methods and systems for providing and managing training through/over networks to remote users via a handheld device.[6]

Embodiments of the claimed invention provide numerous benefits over the prior art, including, but not limited to, receiving training at any location using only a handheld device, and receiving credit for the training taken remotely.[7] The patent specification provides that prior to the invention claimed in the '067 patent, remote training was possible via the use of wired computers[8] or videotape however, such training could not be received anywhere but only at specially equipped locations.[9]

---

[3] Appx0001.
[4] Appx0150-0151.
[5] Appx0016 at 1 (60).
[6] Appx0016 at Abstract and Appx0049 at Column 1, lines 19-35 ("1:19-35").
[7] Appx0051 at 5:51-55.
[8] Appx0050 at 3:12-15.
[9] Appx0049 at 2:57-62.

Moreover, the previous methods for remote training did not allow for the user to interact with an instructor in real time due to the previous remote training being pre-recorded. With the claimed invention, training may be received, claimed, and credited to a particular user at anytime and anywhere[10]. Where the training includes interaction with an instructor in real time[11].

Claim 1 is representative and provides:

> 1. A method of managing training completed remotely at a hand held device, said method comprising the step of:
>
> receiving at a training server training data transmitted to the training server through a data network from a user of a hand held device, the training data representing training taken by the user at hand held device;
>
> receiving identifying information for the user of a hand held device concurrently with the training data file;
>
> identifying the user of the hand held device;
>
> authenticating the identify of the user of the hand held device by requesting authentication data from the user and comparing the authentication data with a master user identification template containing authentication data associated with the user and accessible by the training server to determine if said comparison authenticates the user's identify as an authorized trainee;
>
> recording the training data in memory associated with the training server;
>
> locating at least one training file contained within the training data;
>
> determining status of the training file by comparing the training file with an associated master training template accessible from memory by the training server, the status including a determination if training represented by the training file meets a set criterion including at least one of: pending, incomplete, failed, passed; and recording

[10] Appx0062 at 27:28-40.
[11] Appx0062 at 27:61-64.

training status in memory.[12]

Riggs sued Cengage Learning, Inc., for infringement of the claims of the ‘067 patent on or about May 12, 2022 in the District of Massachusetts.

Appellees filed a Motion to Dismiss on or about August 19, 2021, asserting the claims of the ‘067 patent are directed to patent ineligible subject matter.

A Final Judgment finding the claims patent ineligible was signed on January 21, 2022, dismissing the entire action.[13]

## SUMMARY OF ARGUMENT

To correctly evaluate whether asserted claims are directed to a patent-eligible concept, a court must examine “the focus of the claimed advance over the prior art to determine if the character of the claim as a whole, considered in light of the specification, is directed to excluded subject matter.”[14] The District Court erred in determining the focus of the claims.[15] The District Court further erred by not considering the intrinsic evidence of record when analyzing for an inventive concept.[16]

The District Court determined the focus of the claims was ‘summarized’ as:

[12] Appx0063 at 29:2-29.
[13] Appx0001.
[14] *Trading Techs. Int’l, Inc. v. IBG LLC*, 921 F.3d 1084, 1092 (Fed. Cir. 2019).
[15] Appx0002-0007.
[16] Appx006.

"(1) providing and managing training, and (2) devices which access networks and servers remotely and wirelessly."[17] Using this improper summary as a focus of the claims, the District Court erred in determining the claims were not directed towards "an improvement over existing systems or a novel solution to a technological problem,"[18] finding the claims directed towards abstract ideas, failing the first step of *Alice*.[19] Thus, the District Court erred by not properly determining the focus of the claims as "allowing a user to access and complete training at anytime and anywhere via a handheld device."[20]

The District Court erred in not finding that remotely accessing training via a handheld device is patent eligible subject matter. As claimed, remote, wireless access to training via a handheld device allows a person to train at their pace when and where they prefer, an especially important aspect in today's post-Covid world.[21] Wireless access via a handheld device to training for a particular user was not common-place or conventional in 2001.[22]

As also explained in an embodiment of the '067 patent,[23] accessing training at anytime and anywhere via a handheld device is claimed with sufficient specificity

---

[17] Appx005.
[18] Appx0008.
[19] Appx0005.
[20] Appx0116-0131 at 8.
[21] Appx0049 at 1:60-2:14; 2:45-63.
[22] Appx0016 at (60).
[23] Appx0020 at Colum 1, lines 8-34 (patent priority date of 2003).

to be concrete:[24] Thus, the focus of the claims of the patent are directed towards allowing a user to access and complete training at anytime and anywhere via a handheld device."[25]

The District Court erred in not recognizing the claims of the '067 patent recite an improvement to the underlying technology of training through remote access using a handheld device. Claims directed to improvements to technologies or technological processes, beyond computer improvements, may avoid the full eligibility analysis.[26]

The claims of the '067 patent are more complex than merely reciting the performance of a known business practice on the Internet and are better understood as being necessarily rooted in computer technology in order to solve a specific problem in the realm of computer networks, including the provision of training remotely.[27] Thus, the claim recites an underlying computing technology (hand held device to remotely access training) that is an improvement to the underlying technology (a desktop computer physically connected by wire to the internet).

[24]Appx0116-0131 at 7 ("Embodiments described herein provide numerous applications and implementations of remote access to training….); *See, e.g., SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018).
[25]Appx0116-0131 at 8.
[26] *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316, 120 USPQ2d 1091, 1103 (Fed. Cir. 2016) (claims to automatic lip synchronization and facial expression animation found eligible at Step 1 of the Alice/Mayo test as directed to an improvement in computer-related technology).
[27] *See, e.g. SRI Int'l, Inc. v. Cisco Sys.*, 918 F.3d 1368, 1375 (Fed. Cir. 2019).

Additional claim elements focus on how the remote access works (receiving at a training server training data transmitted to the training server through a data network from a user of a handheld device), which in turn affects what information that is displayed to the user.

While Appellant does not believe reaching the second step of *Alice* is necessary, if considered, the District Court erred by improperly determining whether the claims of the ‘067 patent claim an inventive concept.[28] The District Court did not consider “the elements of each claim both individually and as an ordered combination to determine [that] the additional elements transform the nature of the claim into a patent-eligible application.”[29] There are improvements over the prior art mentioned in the specification of the ‘067 patent that were not considered by the Court including, without limitation, at the time of invention computer based training was limited to desktop computers physically connected by wire to the internet[30] and the ‘067 patent describes and claims advances in wireless mobile device education and training not available as of October 12, 2001[31].

---

[28] *See Alice Corp. v. CLS Bank, Int’l*, 573 U.S, 208, 217, 134 S. Ct. 2347, 23554-5 (2014).

[29] *See, e.g., BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1289 (Fed. Cir. 2018)

[30] Appx0050 at 3:5-24.

[31] Appx0050 at 3:25-4:25.

## STANDARD OF REVIEW

Patent eligibility under 35 U.S.C.S. § 101 is ultimately an issue of law that is reviewed de novo.[32] The patent eligibility inquiry may contain underlying issues of fact which are reviewed for clear error.[33] Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination. Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art. The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional.[34]

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN FINDING THE CLAIMS PATENT INELIGIBLE.

#### A. The District Court Erred in Determining the Focus of the Claims for Patent Eligibility Determination.

To properly evaluate whether asserted claims "are directed to a patent-eligible concept,"[35] a court must examine "the focus of the claimed advance over the prior art to determine if the character of the claim as a whole, considered in light of the specification, is directed to excluded subject matter."[36] Here, the District Court

---

[32] *HP Inc.*, 881 F.3d at 1365.
[33] *See id.* at 1368-70.
[34] *HP Inc.*, 881 F.3d at 1368-70..
[35] *Alice Corp. Pty. Ltd.*, 573 U.S. at 218.
[36] *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1092 (Fed. Cir. 2019).

improperly summarized the focus of the claims thus leading to an error in determining patent eligibility.

As this Court has repeatedly held, in "cases involving computer-related claims," the step-one analysis may be complicated by "close calls about how to characterize what the claims are directed to."[37] Such is the case here, as the District Court, without analysis, stated that the focus of the claims can be 'summarized' as: "(1) providing and managing training, and (2) providing wireless, remote access to training programs."[38] This summary suffers from many flaws. For example, it is fundamental that abstractness is determined by analyzing the claim as a whole, not whether each element standing alone is abstract.[39] Further, the District Court's removal of claim limiting language and of most of the method steps "describe[es] the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to §101 swallow the rule."[40] The United States Supreme Court has cautioned that overgeneralizing claims, "if carried to its extreme, make[s] all inventions unpatentable because all inventions can

---

[37] *BASCOM Glob. Internet Servs., Inc. v. AT & T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016).
[38] Appx0002-0009 at 7
[39] *E.g., Alice Corp.*, 573 U.S. 208, 219, 134 S. Ct. 2347, 2359 (2014); *Eyetalk365 v. Zmodo Tech. Corp.*, No. 2:17- cv-02714-RCJ-PAL, 2018 U.S. Dist. LEXIS 23929, at *13 (D. Nev. Feb. 14, 2018).
[40] *Microsoft Corp.*, 822 F.3d at 1337.

be reduced to underlying principles of nature which, once known, make their implementation obvious[.]"[41] The District Court's summary allows precisely this overgeneralization.

The District Court's over-generalized summary creates error by allowing the determination that the claims are not directed towards the creation of something physical,[42] i.e. by concluding that the patent simply provides "wireless, remote access to training programs," [43] and finding the claims directed towards abstract ideas, failing the first step of *Alice*.[44] However, as provided in the specification and pled in the operable complaint claim 1 of the '067 patent is focused towards "receiving at a training server training data transmitted to the training server through a data network from a user of a handheld device."[45]

The '067 patent's specification teaches the claimed solution for remote training access was not available prior to the invention of the claims of the '067 patent.[46] Further, there is no record evidence of the claimed solution existing prior to the invention of the claims of the '067 patent and thus there is no record evidence

---

[41] *Microsoft Corp.*, 822 F.3d at 1337. (quoting *Diamond v. Diehr*, 450 U.S. 175, 189 n.12 (1981)).
[42] *BASCOM Glob. Internet Servs., Inc. v. AT & T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016) (quoting *Microsoft Corp.*, 822 F.3d at 1339.
[43] Appx0002-0009 at 7
[44] *Id.*
[45] Appx0063 at 29:2-6.
[46] Appx0049 at 2:57-62; Appx0050 at 3:12-15.

that the claimed improvement, "allowing a user to access and complete training at anytime and anywhere via a handheld device"[47] is conventional.[48] Transmitting data via a handheld device was virtually unknown in 2001. Handheld, wireless transfer of data, was not commonplace or conventional in 2001. Thus, the steps for "receiving at a training server training data transmitted to the training server through a data network from a user of a handheld device."[49]

## II. THE DISTRICT COURT'S IMPROPER SUMMARY OF THE CLAIMS MISSED THE FOCUS OF THE CLAIMS.

### A. The Claims are Focused On Communicating Training Data Between a Handheld Device and a Server Wirelessly, Anywhere, Anytime.

To properly evaluate whether asserted claims "are directed to a patent-eligible concept,"[50] a court must examine "the focus of the claimed advance over the prior art to determine if the character of the claim as a whole, considered in light of the specification, is directed to excluded subject matter."[51] In other words, abstractness is determined by analyzing the claim as a whole, not whether each element standing alone is abstract.[52] Taking the claim as a whole, the focus of the claims is "allowing

---

[47] Appx0116-0131 at 8.
[48] Appx0116-0131 at 4.
[49] Appx0063 at 29:2-6.
[50] *Alice Corp. Pty. Ltd.*, 573 U.S. at 218.
[51] *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1092 (Fed. Cir. 2019).
[52] *See e.g., Alice Corp.*, 573 U.S. 208, 219, 134 S. Ct. 2347, 2359 (2014); *Eyetalk365, LLC v. Zmodo Tech. Corp.*, 356 F. Supp. 3d 1059, 1067 (D. Nev. 2018).

a user to access and complete training at anytime and anywhere."[53] ("Focus").

This Focus is supported by the Abstract:

> Methods and systems for p*roviding and managing training through/over networks to remote multimedia device* users are disclosed. Training can be provided through networks to computers and *portable hand held devices*. . . . Training can be received by a *remote trainee through electronic data networks for completion at a wireless device.* Methods and systems are also disclosed for managing remote training. Remote training can be tracked and recorded when completed by a remote *user of a wireless hand held device*. Completed training can be transmitted through an electronic network to course provider servers by a *remote hand held device*. *Remote users* authentication and certification of completed *training received from a hand held device* through an electronic network can be conducted by a training provider's server.[54]

Assessing the focus of the claims from the Abstract is proper as the inquiry may also involve looking to the Abstract or patent specification to understand the problem facing the inventor and, ultimately, what the patent describes as the invention.[55]

Further support for this Focus is provided in the independent claim:

For Claim 1:

> A method of *managing training completed remotely at a hand*

[53] Appx0016-0064 at 1:19-35, Abstract and Claims, *generally*.

[54] Appx0049 at 1:29-31; Appx0016 at Abstract.

[55] *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019) *citing TLI Communs. LLC v. AV Auto., L.L.C. (In re TLI Communs. LLC Patent Litig.)*, 823 F.3d 607, 612 (Fed. Cir. 2016); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1376 (Fed. Cir. 2015) (in the step one analysis, pointing to statements from the specification that supported the identified focus was the key discovery described in the patent).

> *held device*, said method comprising the step of:
>
> *receiving at a training server training data transmitted to the training server through a data network from a user of a hand held device,* the training data representing training taken by the user at hand held device;
>
> receiving identifying information for the *user of a hand held device* concurrently with the training data file;
>
> identifying the *user of the hand held device*;
>
> authenticating the identify of the *user of the hand held* device by requesting authentication data from the user and comparing the authentication data with a master user identification template containing authentication data associated with the user and accessible by the training server to determine if said comparison authenticates the user's identify as an authorized trainee;
>
> recording the training data in memory associated with the training server;
>
> locating at least one training file contained within the training data;
>
> determining status of the training file by comparing the training file with an associated master training template accessible from memory by the training server, the status including a determination if training represented by the training file meets a set criterion including at least one of: pending, incomplete, failed, passed; and recording training status in memory.[56]

The specification of the '067 patent provides further support for the Focus in the Summary of the Invention where it specifies:

> "training" will be used herein primarily to describe all forms of education, instruction and training that the present invention can broadly apply.[57]

The specification continues:

> It is another aspect of the present invention to provide methods and systems for providing continuing legal education instruction

[56] Appx0063 at 29:2-29.
[57] Appx0050 at 4:34-36.

> through electronic networks to wireless hand held devices and their respective users.[58]

and

> Other optional features that can be provided to users include joining a chat discussion on the subject matter of a given course as well as providing a threaded discussion group for review and correspondence among fellow users.[59]

and

> Streaming video can utilize the support of an active connection to the server in order to retrieve video files.[60]

and

> Now CLE requirements can, be achieved virtually anywhere and at any time.[61]

The specification further describes the prior art:

> Computers have become pervasive in all aspects of the business and educational worlds….[62] Computers have also allowed for the dissemination of information either to limited groups or to large audiences via such communication channels as local area networks (LANs), wide area networks (WANs), and the Internet….[63] The present inventor has recognized the convenience that online training and education is bringing to busy workers and professional since the advent of the Internet. The present inventor, however, has also recognized that vast improvements in wireless technology can further enhance current offerings in online education and current training applications that are primarily focused on a "connected" or "wired" world, but physically

---

[58] Appx0050 at 5:51-55.
[59] Appx0056 at 16:63-67.
[60] Appx0062 at 27:57-59.
[61] Appx0062 at 27:34-35.
[62] Appx0050 at 3:5-6.
[63] Appx0050 at 3:12-16.

> connected systems and training application will also continue to experience an explosion of growth and improvement as more people begin to fully realize to positive impact that data networks have on everyday life.[64]

i.e, the problem was how to provide training that is accessible at anytime and anywhere.

The ‘067 patent specification provides substantial detail for the claimed invention and its interconnectivity with each claimed element for sufficient specificity to be concrete.[65] For instance, the claim provides the following details explaining how training is provided anytime and anywhere:

> (1) receiving at a training server training data transmitted to the training server through a data network from a user of a hand held device...;
> (2) receiving identifying information for the user of a hand held device concurrently with the training data file;
> (3) identifying the user of the hand held device;
> (4) authenticating the identify of the user of the hand held device ...;
> (5) recording the training data in memory associated with the training server;
> (6) locating at least one training file contained within the training data;
> (7) determining status of the training file by comparing the training file with an associated master training template accessible ... including a determination if training represented by the training file [is] ... pending, incomplete, failed, passed; and
> (8) recording training status in memory.[66]

---

[64] Appx0050 at 3:59-4:3.

[65] *See, e.g., SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018).

[66] Appx0063 at 29:2-29.

Accordingly, the claim provides sufficient granularity to provide concrete steps. Thus, the focus of the claims of the patent are directed towards allowing a user to access and complete training wirelessly via a handheld device.[67]

## B. The Claimed Invention is an Improvement in Handheld, Wireless Communication.

The District Court did not consider whether the claims of the '067 patent recite an improvement to an underlying technology. As this Court has held, claims directed to improvements to computer-related technology do not need the full eligibility analysis.[68] Claims directed to improvements to other technologies or technological processes, beyond computer improvements, may also avoid the full eligibility analysis.[69] Further examples of improved computer systems with novel features that were deemed directed towards patentable subject matter include a distributed network architecture operating in an unconventional fashion to reduce

---

[67] Appx0049 at 1:19-35; Appx0016 at Abstract; Appx0063-0064 Claims, *generally*.

[68] *Microsoft,* 822 F.3d at 1339, 118 USPQ2d at 1691-92 (claims to a self-referential table for a computer database held eligible at step 1 of the Alice/Mayo test as not directed to an abstract idea).

[69] *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316, 120 USPQ2d 1091, 1103 (Fed. Cir. 2016) (claims to automatic lip synchronization and facial expression animation found eligible at Step 1 of the Alice/Mayo test as directed to an improvement in computer-related technology).

network congestion while generating networking accounting data records.[70] Here, the handheld, wireless communications creates an improved training platform.

The claims of the ‘067 patent are more complex than merely reciting the performance of a known business practice on the Internet and are better understood as being necessarily rooted in computer technology in order to solve a specific problem in the realm of computer networks, including the creation of an improved training platform utilizing handheld, wireless communication.[71] The claims of the ‘067 patent are focused on an application that allows a user to access training via a wireless handheld device. Thus, the claim recites an underlying computing technology (handheld device) and an improvement to the underlying technology (remote access via a handheld device). Additional claim elements focus on how the data is transmitted and accessed, which in turn affects what information that is displayed to the user.

## III. THE DISTRICT COURT FURTHER ERRED BY NOT CONSIDERING THE OTHER INVENTIVE ASPECTS OF THE CLAIMED INVENTIONS.

---

[70] *Amdocs (Israel), Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300-01, 120 USPQ2d 1527, 1536-37 (Fed. Cir. 2016) (a specific distributed network architecture which reduced network congestion when collecting massive amounts of data).

[71] *See, e.g. SRI Int'l, Inc. v. Cisco Sys.*, 918 F.3d 1368, 1375 (Fed. Cir. 2019).

To evaluate whether asserted claims satisfy *Alice*'s second step of "search[ing] for an 'inventive concept,'"[72] a court considers "the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application."[73] While a court may determine patent eligibility at the Rule 12(b)(6) stage, it is "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law."[74] "Plausible factual allegations may preclude dismissing a case under §101."[75] All facts pertinent to the eligibility question must be proven by clear and convincing evidence.[76] Here, Appellant makes numerous factual allegations in the patent specification that are not rebutted by the District Court.

Even if this Court determines Appellant's claims are directed towards an abstract idea, patent eligibility is possible if the abstract idea include[s] 'additional features' to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea."[77] "These additional features cannot simply be well-

---

[72] *Alice*, 573 U.S. at 217, 134 S.Ct. 2347.
[73] *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1289 (Fed. Cir. 2018)
[74] *Green Shades Software, Inc.*, 882 F.3d at 1125).
[75] *Id.*
[76] *HP Inc.*, 881 F.3d at 1368 citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91,95 (2011).
[77] *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 773 (Fed. Cir. 2019) (quotations and alterations omitted); *see also Trading Techs.*, 921 F.3d at 1093

understood, routine, conventional activities *previously known* to the industry."[78] The District Court cited several individual components of the claims stating that each was conventional.[79] However, the District Court erred with regard to training administered via a wireless, handheld device. In this instance what does it mean to be "conventional" and more particularly at the time of the invention, for there is "the insidious attraction of the siren hindsight."[80] Here, while a hand-held device with the wireless ability to transmit training data is well known in 2022, in October 2001 such was not the case. The Claims of the '067 patent provide a solution to a specific problem arising in e-commerce, namely providing training anywhere.[81] The patent specification provides that such transactions were not possible prior to the claimed invention, requiring users who desired to receive training at least locate a wired connection.[82] Thus, the claimed improvements cannot be said to be conventional when viewing the claim as a whole.

---

("Step two 'looks more precisely at what the claim elements add' to determine if 'they identify an inventive concept in the application of the ineligible matter to which...the claim is directed." (quoting *SAP*, 898 F.3d at 1167).

[78] *ChargePoint*, 920 F.3d at 773 (quotation and alteration omitted); *see HP Inc.*, 881 F.3d at 1367 ("The second step of the *Alice* test is satisfied when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry." (quotation and alteration omitted)

[79] Appx0002-0009 at 7

[80] *W.L. Gore & Associates, Inc., v. Garlock, Inc.,* F.2d 1540, 1553 (Fed.Cir. 1983)

[81] Appx0016-0064 at 3:59-4:3..

[82] *See id.* at 1:49-2:63.

Handheld, wireless transfer of data, was not commonplace or conventional in 2001. Thus, the steps for "receiving at a training server training data transmitted to the training server through a data network from a user of a handheld device."[83] The District Court impermissibly used its hindsight when determining that wireless transfer of data via a handheld device was conventional.

### A. The District Court's Order[84]

The District Court's Order notes that "[p]atent eligibility under section 101 may be determined at the rule 12(b)(6) stage only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law,"[85] but fails to appreciate the factual allegations of improvements over the prior art in the '067 patent.

Specifically, in its response, Appellant/Plaintiff analogized the claims of the '067 patent to *Messaging Gateway Sols., LLC v. Amdocs, Inc.,*[86] where claims of "directed to a problem unique to text-message telecommunication between a mobile device and a computer. The solution [ ] it provides is tethered to the technology that created the problem."[87] Similarly, the '067 patent provides a solution for remote

[83] Appx0063 at 29:2-6.
[84] Appx0002-0007.
[85] *Green Shades Software, Inc.*, 882 F.3d at 1125; *see also HP Inc.*, 881 F.3d at 1368.
[86] Civil Action No. 14-732-RGA, 2015 U.S. Dist. LEXIS 49408 (D. Del. Apr. 15, 2015).
[87] *Messaging Gateway Sols., LLC v. Amdocs, Inc.*, Civil Action No. 14-732-RGA, 2015 U.S. Dist. LEXIS 49408, at *15-16 (D. Del. Apr. 15, 2015).

training, ie providing training anywhere, in the trainees home, car, or even restroom by utilizing "training data transmitted to the training server through a data network"[88] Claim 1 of the '067 patent provides:

> A method of managing training completed *remotely at a hand held device,* said method comprising the step of:
>
> *receiving at a training server training data transmitted to the training server through a data network from a user of a hand held device,* the training data representing training taken by the user at hand held device;
>
> *receiving identifying information for the user of a hand held device* concurrently with the training data file;
>
> identifying the user of the hand held device;
>
> authenticating the identify of the user of the hand held device by requesting authentication data from the user and comparing the authentication data with a master user identification template containing authentication data associated with the user and accessible by the training server to determine if said comparison authenticates the user's identify as an authorized trainee;
>
> recording the training data in memory associated with the training server;
>
> locating at least one training file contained within the training data;
>
> determining status of the training file by comparing the training file with an associated master training template accessible from memory by the training server, the status including a determination if training represented by the training file meets a set criterion including at least one of: pending, incomplete, failed, passed; and recording training status in memory.[89]

Claim 1 is more than the Court's summary for at least the step of:

1. Remote (wireless) data transmission utilizing a handheld device.

[88] Appx0063 at 29:4-5.
[89] Appx0016-0064 at 29:2-29.

The present claims therefore, present "an interactive process that enables wireless education , instruction and/or professional development via portable, wireless handheld computer systems,".[90] Users may access the training data so that training "can be achieved virtually anywhere and at anytime.[91] The claims do not try to pre-empt every use of electronic training, but rather recite a specific way to facilitate remote training access allowing training anywhere, anytime rendering the claims patent eligible.[92] An especially relevant type of interaction in today's socially distant world.

### B. Factual Assertions in the '067 Patent that the District Court did not Consider

The District Court failed to consider the following factual allegations of improvements over the prior art, which must be taken as true at this stage of the litigation,[93] including:

> It is another aspect of the present invention that training be provided through an electronic network to hand held devices such as wireless PDAs, mobile phones and pagers.[94]

[90] Appx0016-0064 at 4:5-7.
[91] Appx0016-0064 at 27:34-35.
[92] *See, e.g., DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014).
[93] *Guidry*, 512 F.3d at 180.
[94] Appx0016-0064 at 4:56 – 58; *Green Shades Software, Inc.*, 882 F.3d at 1127-8 (holding that factual assertions must be taken as true).

As is particularly provided for in the patent, claimed embodiments of the invention utilize a wireless, handheld device to access training not simply a hand held device or separately wireless, remote access to training.

The claims facilitate wirelessly, accessing training via a handheld device, a concept that in 2001 was not conventional or well-known.[95] There is nothing in the claim that would constitute "well-understood, routine, and conventional" application of an abstract idea, given the date of the invention.[96] Under *Berkheimer v. HP Inc.*,[97] any determination to the contrary would require a factual determination, one which would take into account the filing date of the application. The factual assertions contained within the '067 patent are inventive and alone enough for the Court to find that the claims of the '067 patent are directed towards patent eligible subject matter.

Whether the claims cover only conventional activities requires a factual determination, which can make it impossible to conclude claims are ineligible on summary judgment.[98] Ultimately, whether or not the claims of the '067 patent refer to conventional technology or not is a factual question and as such dismissing the present suit at this preliminary stage of the suit is premature.

[95] *See, e.g., Green Shades Software, Inc.*, 882 F.3d at 1129.
[96] *Green Shades Software, Inc.*, 882 F.3d at 1129.
[97] 881 F.3d 1360 (Fed. Cir. 2018), *generally*.
[98] *Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018), *generally*.

## CONCLUSION AND RELIEF SOUGHT

The District Court's final judgment should be reversed and the case returned to the District Court because factual issues preclude dismissal at this stage of the litigation.

Date: April 12, 2022

Respectfully submitted,

**Ramey, LLP**

/s/ William P. Ramey, III
William P. Ramey, III
Texas State Bar No. 24027643
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
713-426-3923 (Telephone)
832-900-4941 (Facsimile)

**ATTORNEYS FOR RIGGS TECHNOLOGY HOLDINGS, LLC**

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on April 12, 2022, by email.

William P. Ramey, III
William P. Ramey, III

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)**

The undersigned counsel of records for Appellants/Plaintiff, Riggs Technology Holdings, LLC, certifies that this Principal Brief of Appellants/Plaintiff complies with the typeface requirement provided in Rule 32(a)(5) and type-volume limitation provided in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. In preparing this certificate, I relied on word-count program of Microsoft Word 2018. This Brief contains 5,642 words.

Dated: April 12, 2022

/s/ William P. Ramey, III
William P. Ramey, III
**Ramey, LLP**
Texas State Bar No. 24027643
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
(713) 426-3923 (Telephone)
(832) 900-4941 (Facsimile)
wramey@rameyfirm.com

**ATTORNEYS FOR RIGGS TECHNOLOGY HOLDINGS, LLC.**

# ADDENDUM

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RIGGS TECHNOLOGY HOLDINGS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CENGAGE LEARNING, INC.,<br><br>Defendant. | ) | Civil No. 21-10778-LTS |

JUDGMENT

January 21, 2022

SOROKIN, J.

Pursuant to the Court's Order, Doc. No. 38, dated January 21, 2022, all claims within the Complaint are DISMISSED. Each side shall bear its own fees and costs.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RIGGS TECHNOLOGY HOLDINGS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CENGAGE LEARNING, INC.,<br><br>Defendant. | ) | Civil No. 21-10778-LTS |

MEMORANDUM AND ORDER ON MOTION TO DISMISS (DOC. NO. 13)

January 21, 2022

SOROKIN, J.

Riggs Technology Holdings, LLC ("Riggs") brings this patent infringement action alleging that Cengage Learning, Inc. ("Cengage"), infringes "one or more claims" of U.S. Patent No. 7,299,067 ("the '067 patent"). Doc. No. 1 ¶ 8.[1] Cengage moves to dismiss the complaint on the grounds that the '067 patent is directed to patent-ineligible subject matter under 35 U.S.C. § 101. Doc. No. 13. The motion is fully briefed, and neither party has requested oral argument. Doc. Nos. 14, 28, 34. For the reasons that follow, Cengage's motion is ALLOWED.

## I. BACKGROUND

The'067 patent is entitled "Methods and Systems for Managing the Provision of Training Provided Remotely Through Electronic Data Networks to Users of Remote Electronic Devices." Doc. No. 1-1 at 1. The claimed invention is directed to providing training "through networks to computers and portable hand held devices" including "PDAs, pagers, and wireless phones." Id.

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

(Abstract). It also includes tracking and recording such training, identifying and authenticating users receiving such training, and certifying the results of such training. Id.; accord id. at 34 (Technical Field of the Invention). The specification explains that the '067 patent is intended to solve various logistical and scheduling problems employers confront when arranging necessary job training for employees at in-person programs, via satellite-based instruction, or online through wired computer terminals. Id. at 34-35 (Background of the Invention).

As explained in the patent:

> The present inventor has recognized the convenience that online training and education is bringing to busy workers and professional[s] since the advent of the Internet. The present inventor, however, has also recognized that vast improvements in wireless technology can further enhance current offerings in online education and current training applications . . . . The present inventor has realized that, what is needed in the training field is an interactive process that enables wireless education, instruction and/or professional development via portable, wireless handheld computer systems. The current invention enables users of hand held computers wirelessly coupled to a network (e.g., Internet) to engage in training (e.g., via a multimedia presentation), be evaluated on the understanding gained by the user after the training (e.g., interactive questioning), and allow for reporting (e.g., certification of course completion) of the results of a user's activity and evaluation to a course administrator. Training data can also be used to verify, evaluate, and enhance training, course, student and/or teacher performance and/or development. . . . The present inventor has therefore developed new methods and systems for providing and managing the provision to and execution of training by users via handheld wireless devices . . . .

Id. at 35.[2] The breadth of the invention is plain from the language of the patent. See, e.g., id. at 35 (defining "training" to include "all forms of education, instruction and training that the present invention can broadly apply"); id. at 37 (stating the invention "is to be accorded the widest scope consistent with principles and features disclosed herein").

---

[2] The '067 patent contains three dozen figures, the vast majority of which are "screen shots that are representative of multimedia content that can be associated with methods for carrying o[ut] the present invention." Doc. No. 1-1 at 2-33, 36-37. None are reproduced in the complaint, and no party suggests any figure is especially pertinent to the issues now pending.

The ’067 patent has three independent claims—claims 1 and 7, both “method” claims, and claim 13, a “system” claim. Id. at 48. The complaint focuses its allegations on claim 1, which the parties agree is representative for present purposes. Doc. No. 1 ¶ 9; Doc. No. 14 at 12-13; Doc. No. 28 at 5. It recites:

> **1.** A method of managing training completed remotely at a hand held device, said method comprising the step of:
>
> receiving at a training server training data transmitted to the training server through a data network from a user of a hand held device, the training data representing training taken by the user at [sic] hand held device;
>
> receiving identifying information for the user of a hand held device concurrently with the training data file;
>
> identifying the user of the hand held device;
>
> authenticating the identify [sic] of the user of the hand held device by requesting authentication data from the user and comparing the authentication data with a master user identification template containing authentication data associated with the user and accessible by the training server to determine if said comparison authenticates the user’s identify [sic] as an authorized trainee;
>
> recording the training data in memory associated with the training server;
>
> locating at least one training file contained within the training data;
>
> determining status of the training file by comparing the training file with an associated master training template accessible from memory by the training server, the status including a determination if training represented by the training file meets a set criterion including at least one of: pending, incomplete, failed, passed; and
>
> recording training status in memory.

Doc. No. 1-1 at 48.

## II. LEGAL STANDARD

Federal courts must dismiss cases that fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). “Though the usual basis for a 12(b)(6) motion is the plaintiff’s

failure to plead sufficient facts in its complaint, a motion to dismiss 'may sometimes be premised on the inevitable success of an affirmative defense,'" such as patent invalidity. Oxford Immunotec Ltd. v. Qiagen, Inc., No. 15-cv-13124, 2016 WL 5746639, at *3 (D. Mass. Aug. 31, 2016) (quoting Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006)). Dismissal is warranted if "the only plausible reading of the patent" the plaintiff alleges was infringed "is one that demonstrates that the patent claims cover subject matter that is not eligible for patenting." Id. (quoting Ultramercial, Inc. v. Hulu, LLC, 722 F.3d 1335, 1339 (Fed. Cir. 2013), and OIP Techs., Inc. v. Amazon.com, Inc., 788 F.3d 1349, 1364 (Fed. Cir. 2015)); see also In re TLI Commc'ns LLC Patent Litig., 823 F.3d 607, 609-10 (Fed. Cir. 2016) (affirming grant of a motion to dismiss based on ineligibility).

Subject matter eligibility is a threshold inquiry and a question of law. Bilski v. Kappos, 561 U.S. 593, 602 (2010). Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore." 35 U.S.C. § 101. The broad language of this provision is subject to "three specific exceptions": "laws of nature, physical phenomena, and abstract ideas" are not patentable. Bilski, 561 U.S. at 601. A two-step inquiry determines whether these exceptions apply. First, a court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." Alice Corp. Pty. Ltd. v. CLS Bank Int'l, 573 U.S. 208, 217 (2014); accord Mayo Collab. Servs. v. Prometheus Labs., Inc., 566 U.S. 66, 77 (2012). If they are so directed,[3] a court then "consider[s] the elements of each claim both individually and as an ordered combination to determine whether the additional

[3] If the claims are not directed at one of the identified concepts, the inquiry ends, and the exceptions to § 101 are not implicated.

elements transform the nature of the claim into a patent-eligible application." Alice, 573 U.S. at 217 (quotation marks omitted); accord Mayo, 566 U.S. at 77-80.

Applying the Alice test to claims challenged under the "abstract idea" exception, courts first evaluate "the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter." Affinity Labs of Tex., LLC v. DIRECTV, LLC, 838 F.3d 1253, 1257 (Fed. Cir. 2016) (quotation marks and citation omitted). In the context of computer-related technology, a patent-eligible claim is one directed to a specific "improvement in computer capabilities," rather than "an 'abstract idea' for which computers are invoked merely as a tool." Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1336 (Fed. Cir. 2016); accord TLI Commc'ns, 823 F.3d at 612-13. Also relevant to the inquiry is whether "the claimed invention is entirely functional in nature"—i.e., whether it recites software and other generic computer-related components that perform certain functions, without claiming or describing "how to implement" the desired functions. Affinity Labs, 838 F.3d at 1258. If so, the claimed invention is likely directed to an abstract idea, and the analysis proceeds to step two.

To escape ineligibility at that step, "more is required than well-understood, routine, conventional activity already engaged in by the scientific community" in order "to transform the claim into significantly more than a patent upon the ineligible concept itself." Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc., 827 F.3d 1042, 1047 (Fed. Cir. 2016). It is not enough, for purposes of this analysis, to simply state an abstract idea and then "add[] the words 'apply it,'" Mayo, 566 U.S. at 72, nor does "[t]he introduction of a computer into the claims" satisfy step two, Alice, 573 U.S. at 222.

## III. DISCUSSION

The first step of the Alice inquiry points directly to ineligibility here. Whether the focus is articulated as Cengage urges (i.e., "remotely managing training," Doc. No. 14 at 6) or as Riggs suggests (i.e., "allowing a user to access and complete training at anytime and anywhere," Doc. No. 28 at 8), the '067 patent is plainly drawn to an abstract idea. Indeed, the concept underlying the claims of the '067 patent—providing, managing, and/or documenting training completed remotely on a handheld device—is akin to those found in claims the Federal Circuit has deemed abstract and ineligible. See, e.g., Affinity Labs, 838 F.3d at 1258 (finding ineligible a patent directed to the "abstract idea" of "providing out-of-region access to regional broadcast content"); TLI Commc'ns, 823 F.3d at 610, 611 (finding ineligible a patent directed to "the abstract idea of classifying and storing digital images in an organized manner"); Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 715 (Fed. Cir. 2014) (finding ineligible a patent directed to "the abstract idea of showing an advertisement before delivering free content" even where "certain additional limitations, such as consulting an activity log, add a degree of particularity"); cf. Pres. Wellness Techs. LLC v. Allscripts Healthcare Solutions, 2:15-CV-1559, 2016 WL 2742379, *8 (E.D. Tex. May 10, 2016), aff'd, 684 F. App'x 970 (Fed. Cir. 2017) (finding ineligible a patent claiming "a network-based system [to] manage medical records [and] allow patients and physicians different levels of access" but disclosing no "technological solution that enables that function to be performed in a certain manner").

Considering the elements of the claims and their character as a whole, the Court finds that the '067 patent and its claimed "advance" describe an existing process (providing and managing training) and propose using existing technology (devices which access networks and servers remotely and wirelessly) to achieve the abstract end-result at the heart of the patent (providing

wireless, remote access to training programs). Limiting the abstract idea at issue to one context—training administered and completed via handheld, wireless devices—does not change the step-one analysis of the focus of the patent's claims, as it does not suffice to establish an improvement over existing systems or a novel solution to a technological problem. Affinity Labs, 838 F.3d at 1258-59; TLI Commc'ns, 823 F.3d at 612-13; cf. Enfish, 822 F.3d at 1330-37 (finding eligible a patent claiming a specific and "self-referential" system for storing information in a computer). Nor do the limitations recited in any dependent claim add anything to the abstract idea analysis, for reasons explained by Cengage in its papers. See Doc. No. 14 at 12-13 (identifying limitations contained in dependent claims, none of which confer an inventive concept capable of impacting the eligibility analysis).

Accordingly, the Court proceeds to step two of the Alice analysis. The '067 patent claims contain no inventive concept that can transform the abstract idea to which they are drawn into patent-eligible subject matter because the claimed components and features (e.g., "training data," "server," "data network," "identifying information," "hand held device," and "authentication data")—none of which Riggs claims to have invented—are all generically defined and conventional. See, e.g., Affinity Labs, 838 F.3d at 1263 (affirming dismissal of infringement claim where "the abstract idea of remote delivery" would "be implemented using the conventional components and functions generic to cellular telephones"); Elec. Power Group, LLC v. Alstom S.A., 830 F.3d 1350, 1355 ("Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information."); see generally Doc. No. 1-1 (referring throughout to conventional computer-related technology used as intended). At bottom, the '067 patent discloses the concept or idea that a process (training)

already being performed as a human activity (at in-person and satellite-broadcast events) and via wired computers (online at desktop terminals) could also be performed, in more times and at more places, using wireless technology and handheld devices (which already existed and were in use for other purposes), without proposing or claiming any improvement to such technology or devices in order to accomplish the stated (abstract) result. See Yu v. Apple Inc., 1 F.4th 1040, 1045 (Fed. Cir. 2021) (explaining that a claimed configuration of existing, conventional computer hardware "itself is not an advance" and "does not add sufficient substance to [an] underlying abstract idea" to render it eligible). Such a claim is not eligible for a patent. See generally NetSoc, LLC v. Match Group, LLC, 838 F. App'x 544 (Fed. Cir. 2020).

IV. CONCLUSION

Accordingly, the Court concludes that the claims of the '067 patent are not drawn to patent-eligible subject matter under 35 U.S.C. § 101.[4] Cengage's Motion to Dismiss (Doc. No. 13) is ALLOWED, and Riggs's complaint is DISMISSED.[5]

The clerk shall close this case.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge

[4] This finding echoes the conclusion reached recently by another federal court resolving a nearly identical challenge to the same patent at issue here. See Riggs Tech. Holdings, LLC v. Vagaro, Inc., No. 21-cv-7927, 2022 WL 74179, at * (N.D. Cal. Jan. 7, 2022) (finding "[e]very claim in the '067 patent is invalid under section 101" and dismissing complaint without leave to amend).
[5] Riggs has not requested an opportunity to amend its complaint, nor does anything before the Court suggest that it could supplement the allegations in a way that would alter this Court's determination that the patent, on its face, claims an ineligible abstract idea.

APPEAL,PATENT

# United States District Court
# District of Massachusetts (Boston)
# CIVIL DOCKET FOR CASE #: 1:21-cv-10778-LTS

Riggs Technology Holdings, LLC v. Cengage Learning, Inc.
Assigned to: District Judge Leo T. Sorokin
Case in other court: USCA for the Federal Circuit, 22-01468
Cause: 15:1126 Patent Infringement

Date Filed: 05/12/2021
Date Terminated: 01/21/2022
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Riggs Technology Holdings, LLC** represented by **William P. Ramey , III**
Ramey & Schwaller, LLP
5020 Montose Blvd., Suite 800
Houston, TX 77006
(713) 426-3923
Email: wramey@rameyfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John T. Martin**
KJC Law Firm
10 Tremont Street, 6th Floor
Boston, MA 02108
617-720-8447
Email: jmartin@kjclawfirm.com
*ATTORNEY TO BE NOTICED*

**Michaela M. Weaver**
KJC Law Firm, LLC
10 Tremont Street, 5th Floor
Boston, MA 02108
617-720-8447
Email: mweaver@kjclawfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Cengage Learning, Inc.**
200 Pier 4 Boulevard
Suite 400
Boston, MA 02210

represented by **Neil J McNabnay**
Fish & Richardson P.C.
1717 Main Street
Suite 5000
Dallas, TX 75201
(214) 747-5070
Fax: (214) 747-2091
Email: mcnabnay@fr.com
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Kayleigh E. McGlynn**
Fish & Richardson, P.C. (Bos)
One Marina Park Drive
Boston, MA 02210-1878
617-542-5070
Email: mcglynn@fr.com
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Cengage Learning, Inc.** represented by **Neil J McNabnay**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kayleigh E. McGlynn**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Riggs Technology Holdings, LLC** represented by **William P. Ramey , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John T. Martin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michaela M. Weaver**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/12/2021 | 1 | COMPLAINT against Cengage Learning, Inc. Filing fee: $ 402, receipt number 0101-8771113 (Fee Status: Filing Fee paid), filed by Riggs Technology Holdings, LLC. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet, # 3 Civil Category Form)(Weaver, Michaela) (Entered: 05/12/2021) |
| 05/12/2021 | 2 | NOTICE of Appearance by Michaela M. Weaver on behalf of Riggs Technology Holdings, LLC (Weaver, Michaela) (Entered: 05/12/2021) |
| 05/12/2021 | 3 | REPORT ON THE FILING OF AN ACTION REGARDING PATENT OR TRADEMARK. (Weaver, Michaela) (Entered: 05/12/2021) |
| 05/12/2021 | 4 | ELECTRONIC NOTICE of Case Assignment. District Judge Leo T. Sorokin assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Jennifer C. Boal. (Finn, Mary) (Entered: 05/12/2021) |

| | | |
|---|---|---|
| 05/13/2021 | 5 | Summons Issued as to Cengage Learning, Inc.. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Simeone, Maria) (Entered: 05/13/2021) |
| 05/14/2021 | 6 | NOTICE of Appearance by John T. Martin on behalf of Riggs Technology Holdings, LLC (Martin, John) (Entered: 05/14/2021) |
| 05/20/2021 | 7 | MOTION for Leave to Appear Pro Hac Vice for admission of William P. Ramey, III Filing fee: $ 100, receipt number 0101-8785669 by Riggs Technology Holdings, LLC. (Attachments: # 1 Affidavit of William P. Ramey, III in Support, # 2 Letters of Good Standing)(Weaver, Michaela) (Entered: 05/20/2021) |
| 05/21/2021 | 8 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 7 Motion for Leave to Appear Pro Hac Vice. Added William P. Ramey, III. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Pacho, Arnold) (Entered: 05/21/2021) |
| 08/18/2021 | 9 | NOTICE of Appearance by Kayleigh E. McGlynn on behalf of Cengage Learning, Inc. (McGlynn, Kayleigh) (Entered: 08/18/2021) |
| 08/18/2021 | 10 | CORPORATE DISCLOSURE STATEMENT by Cengage Learning, Inc.. (McGlynn, Kayleigh) (Entered: 08/18/2021) |
| 08/18/2021 | 11 | Assented to MOTION for Extension of Time to August 25, 2021 to File Answer re 1 Complaint, by Cengage Learning, Inc..(McGlynn, Kayleigh) (Entered: 08/18/2021) |
| 08/19/2021 | 12 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 11 Assented to MOTION for Extension of Time to August 25, 2021 to File Answer re 1 Complaint. (Pacho, Arnold) (Entered: 08/19/2021) |
| 08/19/2021 | 13 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Cengage Learning, Inc..(McGlynn, Kayleigh) (Entered: 08/19/2021) |
| 08/19/2021 | 14 | MEMORANDUM in Support re 13 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Cengage Learning, Inc.. (McGlynn, Kayleigh) (Entered: 08/19/2021) |
| 08/19/2021 | 15 | ANSWER to 1 Complaint, with Jury Demand , COUNTERCLAIM against Riggs Technology Holdings, LLC by Cengage Learning, Inc..(McGlynn, Kayleigh) (Entered: 08/19/2021) |
| 08/19/2021 | 16 | MOTION for Leave to Appear Pro Hac Vice for admission of Neil J. McNabnay Filing fee: $ 100, receipt number 0101-8911381 by Cengage Learning, Inc.. (Attachments: # 1 Exhibit 1 - Certification of Neil J. McNabnay)(McGlynn, Kayleigh) (Entered: 08/19/2021) |
| 08/20/2021 | 17 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 16 Motion for Leave to Appear Pro Hac Vice. Added Neil J. McNabnay. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Dore, Samantha) (Entered: 08/20/2021) |
| 08/25/2021 | 18 | Consent MOTION for Extension of Time to 09/19/2021 to File Response/Reply as to 13 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Riggs Technology Holdings, LLC. (Attachments: # 1 Text of Proposed Order)(Ramey, William) (Entered: 08/25/2021) |

| | | |
|---|---|---|
| 08/26/2021 | 19 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 18 Consent MOTION for Extension of Time to 09/19/2021 to File Response/Reply as to 13 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Riggs Technology Holdings, LLC.<br><br>ALLOWED (Dore, Samantha) (Entered: 08/26/2021) |
| 09/09/2021 | 20 | ANSWER to Counterclaim by Riggs Technology Holdings, LLC.(Ramey, William) (Entered: 09/09/2021) |
| 09/13/2021 | 21 | District Judge Leo T. Sorokin: New Civil Cases General Procedural ORDER entered. (Simeone, Maria) (Entered: 09/13/2021) |
| 09/20/2021 | 22 | Consent MOTION for Extension of Time to 09/26/2021 to File Response/Reply as to 13 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Riggs Technology Holdings, LLC. (Attachments: # 1 Text of Proposed Order)(Ramey, William) (Entered: 09/20/2021) |
| 09/21/2021 | 23 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 22 Consent MOTION for Extension of Time to 09/26/2021 to File Response/Reply as to 13 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Riggs Technology Holdings, LLC.<br><br>ALLOWED. (Dore, Samantha) (Entered: 09/21/2021) |
| 09/27/2021 | 24 | MOTION for Leave to Appear Pro Hac Vice for admission of Rodeen Talebi Filing fee: $ 100, receipt number AMADC-8978528 by Cengage Learning, Inc.. (Attachments: # 1 Exhibit 1 - Certification of Rodeen Talebi)(McGlynn, Kayleigh) (Entered: 09/27/2021) |
| 09/27/2021 | 25 | Consent MOTION for Extension of Time to October 3, 2021 to File Response/Reply as to 13 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Riggs Technology Holdings, LLC. (Attachments: # 1 Text of Proposed Order)(Ramey, William) (Entered: 09/27/2021) |
| 09/28/2021 | 26 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 24 Motion for Leave to Appear Pro Hac Vice Added Rodeen Talebi.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Dore, Samantha) (Entered: 09/28/2021) |
| 09/28/2021 | 27 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 25 Consent MOTION for Extension of Time to October 3, 2021 to File Response/Reply as to 13 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Riggs Technology Holdings, LLC.<br><br>ALLOWED. (Dore, Samantha) (Entered: 09/28/2021) |
| 10/04/2021 | 28 | RESPONSE to Motion re 13 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Riggs Technology Holdings, LLC. (Ramey, William) (Entered: 10/04/2021) |
| 10/06/2021 | 29 | Assented to MOTION for Extension of Time to October 18, 2021 to File Reply Brief by |

| | | |
|---|---|---|
| | | Cengage Learning, Inc..(McGlynn, Kayleigh) (Entered: 10/06/2021) |
| 10/06/2021 | 30 | Assented to MOTION for Leave to File Excess Pages *of Reply Brief in Support of Motion to Dismiss for Failure to State a Claim [ECF No. 13]* by Cengage Learning, Inc.. (McGlynn, Kayleigh) (Entered: 10/06/2021) |
| 10/07/2021 | 31 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 29 Assented to MOTION for Extension of Time to October 18, 2021 to File Reply Brief by Cengage Learning, Inc.<br><br>ALLOWED. (Dore, Samantha) (Entered: 10/07/2021) |
| 10/07/2021 | 32 | Reset Deadlines as to 13 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . Replies due by 10/18/2021. (Dore, Samantha) (Entered: 10/07/2021) |
| 10/07/2021 | 33 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 30 ssented to MOTION for Leave to File Excess Pages of Reply Brief in Support of Motion to Dismiss for Failure to State a Claim [ECF No. 13] by Cengage Learning, Inc.<br><br>ALLOWED.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Dore, Samantha) (Entered: 10/07/2021) |
| 10/18/2021 | 34 | MEMORANDUM in Support re 13 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Cengage Learning, Inc.. (McGlynn, Kayleigh) (Entered: 10/18/2021) |
| 01/12/2022 | 35 | Notice of Supplemental Authorities re 13 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (Attachments: # 1 Exhibit A - Riggs Tech v Vagaro Inc)(McGlynn, Kayleigh) (Entered: 01/12/2022) |
| 01/18/2022 | 36 | MOTION to Stay by Riggs Technology Holdings, LLC. (Attachments: # 1 Text of Proposed Order)(Ramey, William) (Entered: 01/18/2022) |
| 01/19/2022 | 37 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 36 MOTION to Stay.<br><br>DENIED. (Dore, Samantha) (Entered: 01/19/2022) |
| 01/21/2022 | 38 | District Judge Leo T. Sorokin: ORDER entered. MEMORANDUM AND ORDER ON MOTION TO DISMISS (DOC. NO. 13 )<br><br>Cengage's Motion to Dismiss (Doc. No. 13) is ALLOWED, and Riggs's complaint is DISMISSED. (Dore, Samantha) (Entered: 01/21/2022) |
| 01/21/2022 | 39 | District Judge Leo T. Sorokin: ORDER entered. JUDGMENT. (Dore, Samantha) (Entered: 01/21/2022) |
| 02/08/2022 | 40 | NOTICE OF APPEAL to the Federal Circuit as to 39 Judgment, 38 Order on Motion to Dismiss for Failure to State a Claim by Riggs Technology Holdings, LLC Filing fee: $ 505, receipt number AMADC-9174745 Fee Status: Filing Fee paid. US District Court Clerk to deliver official record to Court of Appeals by 2/28/2022. (Ramey, William) (Entered: 02/08/2022) |
| 02/09/2022 | 41 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals for the Federal Circuit re 40 Notice of Appeal to the Federal Circuit, (Paine, Matthew) (Entered: 02/09/2022) |
| 02/11/2022 | 42 | USCA for the Federal Circuit Case Number 22-1468 for 40 Notice of Appeal to the |

| | | |
|---|---|---|
| | | Federal Circuit, filed by Riggs Technology Holdings, LLC. (Paine, Matthew) (Entered: 02/11/2022) |

---



| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 04/05/2022 13:32:24 | | | |
| **PACER Login:** | RameyBrowning | **Client Code:** | Riggs |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-10778-LTS |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

US007299067B2

(12) **United States Patent**
**Riggs**

(10) **Patent No.: US 7,299,067 B2**
(45) **Date of Patent: Nov. 20, 2007**

(54) **METHODS AND SYSTEMS FOR MANAGING THE PROVISION OF TRAINING PROVIDED REMOTELY THROUGH ELECTRONIC DATA NETWORKS TO USERS OF REMOTE ELECTRONIC DEVICES**

(76) Inventor: **Lee Riggs**, 1615 Westop Trail, Knoxville, TN (US) 37923

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 496 days.

(21) Appl. No.: **10/269,259**

(22) Filed: **Oct. 11, 2002**

(65) **Prior Publication Data**

US 2003/0074558 A1 Apr. 17, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/329,088, filed on Oct. 12, 2001.

(51) **Int. Cl.**
*H04Q 7/20* (2006.01)

(52) **U.S. Cl.** .................... **455/556.2**; 455/557; 370/292

(58) **Field of Classification Search** ................ 455/403, 455/414.1, 407–408, 418, 419, 424, 412.1, 455/556.1, 556.2, 557, 550.1, 411; 370/292, 370/208, 210, 219, 335, 441; 707/1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,353,604 B2 * 3/2002 Grimwood et al. ......... 370/335
6,665,308 B1 * 12/2003 Rakib et al. ................ 370/441
2002/0049709 A1 * 4/2002 Miyasaki et al. .............. 707/1
2004/0131011 A1 * 7/2004 Sandell et al. .............. 370/210

* cited by examiner

*Primary Examiner*—CongVan Tran
(74) *Attorney, Agent, or Firm*—Ortiz & Lopez; Luis M. Ortiz; Kermit D. Lopez

(57) **ABSTRACT**

Methods and systems for providing and managing training through/over networks to remote multimedia device users are disclosed. Training can be provided through networks to computers and portable hand held devices. Handheld devices can include PDAs, pagers, and wireless phones. Training can be received by a remote trainee through electronic data networks for completion at a wireless device. Methods and systems are also disclosed for managing remote training. Remote training can be tracked and recorded when completed by a remote user of a wireless hand held device. Completed training can be transmitted through an electronic network to course provider servers by a remote hand held device. Remote users authentication and certification of completed training received from a hand held device through an electronic network can be conducted by a training provider's server. Training providers can identify and/or authenticate users of completed instruction and training received from a hand held device and transmitted through an electronic network using biometrics. Completed training can certified by sending certification of training results to trainees and associated third parties. Certification can be provided via electronic means that can include e-mail receipt and/or automatic generation of paper-based communication (e.g., letter/certificate).

**18 Claims, 32 Drawing Sheets**



Case: 22-1468 Document: 13 Page: 52 Filed: 04/12/2022




*Fig. 1*




*Fig. 3*




*Fig. 2*


160
GPRS
162
CDMA
158
GSM
164
PAGING NETWORK
156
PERSONAL AREA NETWORK (BLUETOOTH)
NETWORK (WIRELESS)
166
TDMA
154
CDPD
152
168
WIN

*Fig. 4*




*Fig. 5*


610
USER LOGIN
615
USER VERIFICATION/ AUTHENTIFICATION
620
USER PROVIDED COURSE LIST/INFO
625
USER SELECTION OF COURSE/BAUD RATE
630
BEGIN PROGRAM

Fig. 6


710
COURSE BEGAN
720
USER PROVIDED COURSE ORIENTATION/QUESTIONS
730
USER SELECTION OF QUESTIONS/EVALUATION
740
COURSE SUBMITTED FOR RECIEPT BY SERVER

Fig. 7


810
COURSE RESULTS RECEIVED BY SERVER
820
USER VERIFICATION/AUTHENTICATION
830
COURSE SAVED/EVALUATED
840
SATISFACTORY COMPLETION?
NO
850
NOTIFY
YES
860
COURSE REPORTED/RECORDED/CERTIFIED

*Fig. 8*


910
JAMES BROWN, ESQ.
Biography
Picture
Audio Interview
Close Window
912
930
916
914
Sample Scenario
"Your client is under investigation for possible civil or criminal liability under the federal income tax laws. He has obtained from his accountants certain documents relating to the accountants' preparation of his tax returns and transferred the documents to you to assist him in connection with the investigation. Subsequently, the Internal Revenue Service serves a summons on you directing you to produce the documents."
922
920
Back
Next

*Fig. 9*




*Fig. 10*


LAWYERSLEARN.COM
1101
About Us
1102
Help/Tutorial
1103
Student Lounge
1104
Course Register/Catalog
1105
State CLE Requirements
1106
Faculty
1107
New Online Course:
Employment Law
Arbitration In A Nutshell
An appreciation for Employment Arbitration requires an understanding of both arbitration and statutory employment law issues. This Course will introduce the student to both of these concepts and will enhance the knowledge of the experienced practitioners in these areas in the wake of Circuit City Stores v. Adams, 69 USLW 4195, 121 S. Ct. 1302, 2001 WL 273205 (March 21, 2001).
Sign Up Today!!!

*Fig.* 11


ABOUT US
1203
1205
1207
Our Company
Investor Relations
Become A Course Author
Our Officers And Board
Become An Alliances Member
Contact Us
1204
1206
1208
About Us
Help/Tutorial
Student Lounge
Course Register/Catalog
State CLE Requirements
Faculty
Home
1201
LAWYERSLEARN.COM, INC.
Online CLE over the next 5 years will experience an explosion as more and more legal professionals realize the positive impact that the internet and online CLE provides.
Our years of researching the legal profession have determined the general consensus is that most legal professionals are concerned over losing valuable "peak time" hours to obtain CLE credits. While all agreed in the necessity of CLE, the consensus appeared that most members of the legal community would welcome a cost effective alternative providing that two key issues were addressed.
• It must maximize time management by being easily accessible, concise in presentation, and in a user-friendly format.
• It must be not only informative, but entertaining in it's presentation.
LawyersLearn.Com, Inc. executive team and advisory board consists of some of the top professionals in their fields, which together developed an exciting solution, LawyersLearn.Com.
While attention was given to the quality of the layout and design, the highest priority was ensuring that the quality level of instruction would be unsurpassed. Our online courses are written by some of our nations top legal professionals, and have elicited overwhelmingly positive comments from our students.
Whether you're thinking of taking a course online, or becoming one of our growing alliance members, we encourage you to take a tour of our facility and please contact us if we can assist you.
1202
Download Our Brochure!

*Fig.* 12


ABOUT US
Our Company
Investor Relations
Become A Course Author
Our Officers And Board
Become An Alliances Member
Contact Us
About Us
Help/Tutorial
Student Lounge
Course Register/Catalog
State CLE Requirements
Faculty
Home
The Challenges of the Bar Associations
Course development is the most important issue facing Bar Associations in their effort to be competitive in the field of online CLE. Bar Associations need quality courseware that is user-friendly and of the highest educational value.
Development of these types of courseware can be time-consuming to create and costly to produce. Some associations have tried taking shortcuts with low-quality programming, only to find that they simply lose repeat sales to other vendors. The member continues to shop for the best product or, worse yet, the member simply chooses not to "Log-On" for his/her CLE.
Creating a successful format is an on-going evolution that gently brings the user with it. The user should always be challenged by the content of the course and NEVER by the process. A successful program must have an ample selection of courseware and a plan to expand and update the inventory, as demand requires. You can't sell from an empty shelf or a shelf full of yesterday's products.
A wide selection of top-quality courseware delivered in an easy and consistent interface is what your member is looking for, willing to pay for, and most importantly, what they will keep coming back for!
The Solution - LawyersLearn.Com
Forming a strategic alliance with LawyersLearn.com will allow your Bar Association to offer your membership top-quality education at minimum cost and allow your Bar Association a potential for an excellent revenue stream. Courseware will continue to be developed by our Alliance Members, our independent Attorney Contractors and in-house professors.
The Program
Brand Name
Your Bar Association will select and use your own University Name, you will be supplied a Web address and Internet Domain that will invisibly point to the LawyersLearn.com learning center. When your members access your University from your assigned address, all university & bar logos and artwork will identify your Association.
We will create an Online University brand that will be yours and yours alone. When users log into your university via the provided web address they will see your identity not that of a vendor. We believe it is important that the users always feel they are visiting an extension of your web site rather than an off-site third party. Our goal is not just to provide online CLE but to help you create a true member benefit. Your branding is also important, in case at the end of your contract period you decide not to renew, you will be able to take your now established brand and continue

*Fig. 13*



HELP / TUTORIAL
About Us
Help/Tutorial
Student Lounge
Course Register/Catalog
State CLE Requirements
Faculty
Home
Welcome! to the most user-friendly online CLE program on the internet! No doubt you've seen some programs so convoluted that it seems you should not only get a completion certificate, but qualify for your pilots license at the same time. This Help / Tutorial section was designed to give you easy "one-click" access to the answers of the most frequently asked questions. If after reviewing you still have questions, our tech support team can be reached LIVE on-line through the "student lounge" link at the left. Click on the links below to begin, and thank you again for selecting us as your on-line CLE provider.
1401
Let's Begin!
Brief overview of the course and how to begin.
1402
Your Course
1403
Registration!
Registration is a snap! Click here to find out more!
1404
Take A Course Tour!
Take a quick course tour and you'll agree that this is the easiest on-line CLE ever!
1405
How Do I .... ?
Click on the links below to find the answers to some of the most frequently asked questions.
1406
Miscellaneous Stuff
Plug-in support and browser compatibility are answered below in our easy click-through interface.
Book-Mark A Page
1411
Contact Course Authors
1412
Contact Technical Support
1413
Download Course Materials
1414


*Fig. 14A*


Download Course Materials
Click on the link below to download the current course materials. These handouts will allow you to review the course materials off-line.
1421
Click Here To Download This Course
1422
Click Here To Download Course Opinions
The course materials above are provided in Adobe.PDF format, and zipped to conserve space. For additional information or to download the latest versions of Adobe Reader and WINZIP visit our Course Help Page.
Close Window
1423

*Fig. 14B*


Let's Begin!
We realize that your time is valuable, and to that end we have strived to create these course offerings to be as simple, informative, and as entertaining as possible. Our course authors consist of some of the nations leading attorneys in their fields whose feedback was instrumental in the design of these courses.
Select your course by clicking on the "Course Catalog" button on the navigational bar where you will find our course listings currently available. Simply select the course you wish to take and click on the course link. You will then be automatically transported to the course registration page.
Close Window

Fig. 15


Your Course
will start with a brief outline then proceed with a series of scenarios. You will be asked questions based upon the scenarios given. You will be told immediately whether your answer was correct or incorrect by our online "judge". The answers are further expanded and in most cases contain links to the referenced case law for further clarification. User-friendly navigational buttons guide you through the course, and even allow you to pose questions to the course author through our "Ask The Mentor" program which is accessible from and page within the course.
EACH COURSE WAS DESIGNED TO TAKE APPROXIMATLY 1 HOUR TO COMPLETE.
Your modem speed and system resources may vary your time slightly.
Close Window
1601
1602

Fig. 16


Registration!
allows you to confirm your course selection as well as provide us with the information necessary to ensure you receive proper course credit. Once completed you will transported to a confirmation screen where you will be given your class username and class password. Write these down, as they will allow you to leave and rejoin the course at any time. If you choose to start the course immediately, simply click on the course link to begin.
Close Window

*Fig. 17*

**Course Tutorial**

This page gives you on overview of the navigational buttons and course instruction to help you get the most out of your Online CLE Course.

**Getting Started:**

We realize that busy schedules mean that you may not complete your course in one sitting, so to simplify the "log on" process we utilize "cookies" to assist you. Once you have registered for the course, you will be provided a "user-name" and "password". If you leave the site, upon your return to our home page you will see the following graphic:

1802

**Welcome Back**, Click here to rejoin your Class.

Once selected, you will be returned to your course at the place you left off.

**Navigating The Course:**

As you begin the course you will notice several navigational buttons designed to easily move you through the course. Read the query and select the response you feel is the most appropriate by clicking on the button of your choice. Once your choice is made you will automatically move to the answer page where our online "Judge" will review your response. Course navigational buttons include:




**YES:** Click if you feel this is the best response to the query

**NO:** Click if you feel this is the best response to the query

**MAYBE:** Click if you feel this is the best response to the query

**BACK:** Click to return to the last visited page

**NEXT:** Click to advance to the next page

1801

1803



**YOU'RE CORRECT:** Your selected answer to the query was the correct response!

*Fig. 18*


Course Tutorial
1901
YOU'RE INCORRECT:
Your selected answer to the query was the incorrect response!
Also:
1902
• The case law relevant to the question have been linked for your convenience.
• Each course was designed to take an average of 1 hour to complete, however your modem speed may affect time.
• At the end of the course you will automatically be taken to the course :Post Test".
1903
• Upon satisfactory completion of the "Post Test" you will be issued a certificate of completion
NEED MORE ASSISTANCE?
1905
For additional questions or information, click to contact our support staff.
Close Window

*Fig. 19*


Course Introduction
The first page of the course begins with a "Course Introduction
The Course Introduction gives you an overview of the selected course. It explains the course objectives and how the course will proceed.
The "Course Introduction" provides students with a course overview and objectives.
Generally, most of the courses provide a series of fact situations that present you with various dilemmas. You will then be required to answer a question stemming from the dilemma with either "Yes", "No", or "Maybe" . In some cases this may not be entirely fair, but then a lot of things are not "fair". The objective is to present the issues for your deliberation in an informative, yet entertaining manner.
2001
Click on the "NEXT" button to continue
2002
Next

*Fig. 20*


The Scenario ...
The "Scenario" sets up a series of questions to which the student will respond.
Once you have begun the course, you will be provided a series of questions by a "scenario" (see sample below). The scenario is a short outline of a particular situation, or a series of "what if's" to which you will respond. Once you have read the scenario you can proceed by clicking on the navigational button below.
Sample Scenario
"Your client is under investigation for possible civil or criminal liability under the federal income tax laws. He has obtained from his accountants certain documents relating to the accountants' preparation of his tax returns and transferred the documents to you to assist him in connection with the investigation. Subsequently, the Internal Revenue Service serves a summons on you directing you to produce the documents."
2101
Navigation is easy, allowing for page review and movement throughout the course
2102
2103
Back
Next
2104
For an overview of all site navigational buttons
Click Here

*Fig. 21*


Query:
The "Query" draws questions from the previous scenario (see sample below). The solicited response is generally "Yes", "No", or "Maybe".
2205
Sample Query
Is your client's 5th Amendment privilege violated by enforcement of the summons?
2201
2202
2203
No
Yes
Select Either Button to Continue
Throughout the course you will find links (such as the one left) which link to the case law.
2204
Back

Fig. 22


FIFTH AMENDMENT [U.S. Constitution] - 'No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb, nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation.'
Close Window

Fig. 23


Our "Judge" will let you know if your selection was correct or incorrect
2401
Our Judge will let you know if your selection was correct or incorrect, and further elaborate to clarify the answer, and in most cases, provide easy "on-click" access to the supporting legal opinion.
Back
Next
2402
2403

*Fig. 24*


That's It!
As you can see the course is designed to be both informative as well as entertaining. Interactive button bars ensure that the answers to any questions you might have during your course are only a mouse click away.
0%
100%
2501
SO WHAT ARE YOU WAITING FOR? SIGN UP TODAY!
The Status Grid let's you know where you are within the course
NOTE: Course Layouts may vary slightly based on course material.
Next

*Fig. 25*

**Your Schedule, Your Pace!**

You may leave and re-enter the course at anytime, enabling you to take the course as **YOUR** schedule dictates. Once you begin the course, should you log off our site, upon return you will be asked if you wish to rejoin your class. Click the link, and you will automatically return to where you left off.

If you have registered, but have not yet begin the course, you may begin the course at any time by clicking on the "classroom" button and selecting the course you have registered for. You will be then prompted for your class username and class password

**That's It!**

Once you have finished the course you will complete a short online post-test and be given information on how to obtain your course completion certificate.

**Thank You!**

for selecting us for you online CLE provider. We welcome your suggestions, comments, or feedback. If we can provide any additional information please Contact Our Technical Support Staff.

Close Window

*Fig. 26*


STUDENT LOUNGE
About Us
Help/Tutorial
Student Lounge
Course Register/Catalog
State CLE Requirements
Faculty
Home
Welcome To Our Student Lounge
Please choose the Lounge to log into based on your Internet Connection Speed.
2701
Connect to Student Lounge #1
This link is for students with a FAST Internet connection (ISDN or faster). - Sounds and Graphics
2702
Connect to Student Lounge #2
This link is for students with a SLOW Internet connection (Modems 28 - 56K). - No Sounds or Graphics
Questions, comments, or difficulties, please contact our support staff

*Fig. 27*


STUDENT LOUNGE
About Us
Help/Tutorial
Student Lounge
Course Register/Catalog
State CLE Requirements
Faculty
Home
Welcome To Our Student Lounge
Please wait until the login screen appears*, it should appear in less than one minute! Have Fun Chatting...
Just Type Your Name Then Login!
* If the "nickname" box and the "connect" button fail to appear, your browser may either not support Java script or Java support may not be activated. For additional information click on your browser's "help" menu.
Questions, comments, or difficulties, please contact our support staff

*Fig. 28*


COURSE CATALOG/REGISTER
About Us
Help/Tutorial
Student Lounge
Course Register/Catalog
State CLE Requirements
Faculty
Home
Course Categories
Select the Course Category
By clicking the VIEW Button
2901
LAWYERSLEARN COURSES:
GENERAL LAW
View Course List
LAWYERSLEARN COURSES:
RECENTLY POSTED
View Course List
2902
STATE SPECIFIC COURSES:
View Course List
2903

*Fig. 29*



REGISTRATION/CLASSROOMS
About Us
Help/Tutorial
Student Lounge
Course Register/Catalog
State CLE Requirements
Faculty
Home
General Law Courses
Our course selection includes courses from nationally-known authors on such varied subjects as ethics, evidence, mediation, and the law governing non-profit corporations
*COURSE TITLE
REGISTRATION OPTIONS
COURSE SYNOPSIS
RESUME COURSE
*ADA and the Workplace
*Advocacy Ethics
*Basics of Patent Law
*Character Evidence
*Copyright in a Nutshell
*Evidence/Hearsay 101
* Evidence/Hearsay 102
* Evidence/Hearsay 103
* Evidence/Relevance 101
*Introduction to Arbitration
*Introduction to Article 9
Secure Registration
Un-Secure Registration
Synopsis
Resume


*Fig. 30*


FACULTY
About Us
Help/Tutorial
Student Lounge
Course Register/Catalog
State CLE Requirements
Faculty
Home
Meet Your Instructors
LANCE B. BRACY
Biography
JACK BURGIN
Biography
SCOTT D. GAREY
Biography
LAURA CHASTAIN
Biography
RICHARD L. HOLLOW
Biography
KERMIT LOPEZ
Biography
JOE E. MANUEL
Biography
JAMES MOORE
Biography
JUDGE ROBERT MURRIAN
Biography
LUIS M. ORTIZ
Biography
PAM REEVES
Biography
3101

*Fig. 31*


JAMES MOORE, ESQ.
Biography
Picture
Audio Interview
Close Window
3203
3202
3204
James R. Moore is a partner in the Knoxville, Tennessee law firm of Moore & Brooks. His practice includes commercial litigation, bankruptcy and creditors' rights. Mr. Moore has extensive experience in complex financial litigation and RICO actions involving fraud, fraudulent transfers and off-shore entities, representing both plaintiffs and defendants. In cases involving the investigation of alleged criminal activities, Mr. Moore has worked closely with the U. S. Attorney's office, the State Attorney General's office, the Federal Bureau of Investigation, the Internal Revenue Service, and the Tennessee Bureau of Investigation.
Mr. Moore is currently the East Tennessee Governor to the Tennessee Bar Association Board of Governors. He was the first Chief-Editor of TBALink, (the Tennessee Bar Associations World Wide Web site); Chairman of the TBA's Future-CLE Committee, (developing a prototype on-line CLE course); the first Dean of the Tennessee Bar Association's on-line University; Member, Tennessee Bankers Association Electronic Signature Task Force; and, a member of the University of Tennessee College of Law Alumni Advisory Counsel. He has lectured and written articles on ethics, electronic transactions, Internet research and Internet resources.
Mr. Moore is admitted to practice in the State of Tennessee, the United States District Court, and the United States Court of Appeals for the 6th Circuit. He received his legal education at the University of Tennessee (J.D. 1977).
3201

*Fig. 32*


Thank You! for joining our Beta Team!
Follow the simple synchronization instructions below to experience the most exciting breakthrough in CLE!
AvantGo
Download AvantGo software for your PDA, FREE by clicking the link below. Once completed, select your course by clicking on the link at right.
Already have AvantGo on your PDA? Select your course below and click the link to automatically add the course to your AvantGo channels.
Download PDA Software
AvantGo software
3301
3302
3303
Download Course Files
Evidence/Hearsay 101
Ethics of Corporate Representation
Once you have completed the course, please email your comments / corrections by clicking the link below
Comments / Corrections
Do Not distribute this link to anyone. This beta course is for the sole use of pre-selected Beta Team members only. By downloading the course you agree that you will not disclose any information concerning the course, it's format, or its execution to anyone not directly connected to Lawyerslearn.com, Inc.
LAWYERS LEARN.COM
© Copyright 2002 Lawyerlearn.com, Inc.

*Fig. 33*


AvantGo
HOME
PRODUCT & SERVICES
SUPPORT
PARTNERS
NEWS
EVENTS
COMPANY
HOW
LOGIN
User Login
LOGIN ERROR
We were unable to retrieve your account.
Please re-enter your username and password:
3401
USERNAME:
3402
PASSWORD:
REMEMBER MY USERNAME
3403
SUBMIT
Still having trouble logging in? Click Here
Don't have an account? Get one, free of charge, by clicking here
Your use of this site and the service is subject to AvantGo's Privacy Statement and Terms of use.
Legal Copyright 2001 AvantGo, Inc. All rights reserved

Fig. 34


AvantGo
HOME
PRODUCT & SERVICES
SUPPORT
PARTNERS
NEWS
EVENTS
COMPANY
HOW
SEARCH CHANNELS
Look For:
Only in:
In all regions
GO
SELECT REGION
CHANNEL CATEGORIES
New channels
Automotive (8)
Business/Finance (194)
Education (19)
Entertainment (180)
Health (43)
International (565)
Lifestyle (100)
Local (126)
News/Media (149)
FEATURED CHANNELS
COOL CHANNELS
(AVANTGO STAFF FAVORITES)
DominoPower Magazine
Domino Power Magazine is the leading magazine about ...
Encarta
Encarta is the leading magazine about ...
Pocket Doctor
Pocket Doctor gives you a Doctor in your Pocket, providing ...
AVANTGO USERS' TOP CHANNELS
1. The Wall Street Journal
2. CNN
3. Yahoo
4. New York Times
5. MSN Mobile
6. The Weather Channel
7. USAToday.com
8. Sony USA
My Account
CLE2 Go Evidence/Hearsay
CNNfn
Forbes.com
The Wall Street Journal
3501
CREATE
Welcome, lortiz
Download
Help
3502

*Fig. 35*


AvantGo
HOME
PRODUCT & SERVICES
SUPPORT
PARTNERS
NEWS
EVENTS
COMPANY
HOW
MY ACCOUNTS
MYCHANNELS
AVANTGO WIRELESS
ACCOUNT SETTINGS
SOFTWARE SETUP
SYNC LOG
My CHANNELS
BACK TO CHANNEL
CURRENT
CLE2 Go Evidence/Hearsay 101
133k
CNNfn
27k
3601
Forbes.com
2k
3602
The Wall Street Journal
46k
DELETE CHECKED
3603
Create Custom Channel Wizard
Use the easy, step-by-step wizard to add your own favorite website to your handheld device.
Create Custom Channel Classic
Add your own favorite website to your handheld device using the classic channel creation interface.
AvantGo AutoChannels™
Create a channel for your handheld while surfing just by clicking a button or choosing a bookmark.
Export Channels
Generate URLs which can be used to add your channels to anyone's account.
Import AvantGo Version 1.x Channels
Migrate older channels data files for viewing on the latest AvantGo software.

*Fig. 36*

# METHODS AND SYSTEMS FOR MANAGING THE PROVISION OF TRAINING PROVIDED REMOTELY THROUGH ELECTRONIC DATA NETWORKS TO USERS OF REMOTE ELECTRONIC DEVICES

## PRIORITY TO PREVIOUSLY FILED PROVISIONAL APPLICATION

The present invention claims priority to a previously filed Provisional Patent Application, Ser. No. 60/329,088, entitled "Methods and systems for providing education, instruction and/or training through an electronic network to end user computers and/or hand held devices," which was filed on Oct. 12, 2001 and is herein incorporated by reference.

## TECHNICAL FIELD OF THE INVENTION

The present invention is generally related to methods and systems for electronically providing education, instruction and/or training to remote end-users. Furthermore, the present invention is related to electronic methods and systems for managing remote training activities, including providing accreditation support to professionals, such as, for example, attorneys, accountants, doctors, engineers, nurses, and so forth. More particularly, the present invention is related to methods and systems for carrying out at least one of: remotely providing training, remotely completing training, registering users, authenticating users, managing remote training, and certifying completion of remote training. The present invention is also related to the use of wireless electronic hand held devices, such as Personal Digital Assistants (PDAs), pagers, mobile phones and other data network-enabled portable wireless devices for providing and carrying out remote training.

## BACKGROUND OF THE INVENTION

Today, seemingly more than in the past, companies are discovering that the general work force is ill-equipped and ill-trained, through a lack of formal training, prior work experience, or participation in apprenticeship programs, to perform necessary job-related tasks. Companies are also discovering that ill-trained workers fall into two major categories including a first category of workers who are new to a company's industry and who have none of the necessary skills to perform tasks of interest on behalf of their companies.

In order to accomplish the task of providing training to employees, many companies send their employees to training programs, which are generally developed and conducted by an in-house training department or may be a function under contract to an outside firm to deliver company-specific content designed to meet company-defined training objectives. A company may also send its workers to training programs, conducted by outside firms or organizations that are designed to generically train employees of a certain industry in a particular subject or task associated with their employment.

Regardless of who develops, designs, and/or conducts a training program, such programs typically require that an employee attend a number of training sessions at a selected training site. Unfortunately, the training site is often distant from the employee's normal workplace (particularly when the training program is conducted by an outside firm or organization not under contract to the employee's company) and the training sessions are often on days and at times that



do not conveniently fit into the employee's schedule. As a result, the employee may have to travel between the training site and the workplace and may possibly have to stay overnight near the training site.

By requiring the employee to travel and to attend training sessions on inconvenient days and at inconvenient times, the employee's personal and professional lives can also be interrupted, potentially upsetting or distracting the employee and reducing his/her ability to learn new skills. Additionally, the employee's company typically incurs direct expenses related to the employee's travel and indirect expenses associated with the opportunity cost of work not being accomplished while the employee is at the training site or while the employee travels to and from the training site.

The professional ranks are also seeing a need for a more efficient means to undergo training. For example, Continuing Legal Education ("CLE") had found its way to the Internet with well-known service providers such as LawyersLearn.com, Inc. LawyersLearn.com is currently delivering online continuing legal education to attorneys, whom are well known as a group to have limited time to attend live courses. Online CLE is a very reasonable alternative to live CLE seminars as a means for attorneys to complete their annual Minimum Continuing Legal Education (MCLE) requirements (required by most State Bars).

Training material offered by typical training programs can generally include presentations by individuals having certain relevant knowledge or expertise, "how-to" demonstrations, and "hands-on" training exercises. Such training sessions, especially if conducted without adequate company control, are often too long in duration and present too much training material, thereby causing many trainees to lose concentration and, otherwise, causing them to fail to comprehend and absorb the material. To make matters worse, it can be impossible to evaluate a trainee's comprehension and understanding of the training material provided in such training sessions without evaluation. Without feedback, it can be difficult to determine whether or not additional training is necessary and, if so, it can be difficult to conduct immediate reinforcement training. Furthermore, unless a training program is developed in-house or under contract, the content of such training sessions may include material not relevant to, or up to date with, the objectives of a company.

Many companies have also attempted to overcome disadvantages associated with trainees having to travel to attend training programs by offering satellite-based instruction at the trainee's place of business. Unfortunately though, satellite-related equipment for satellite-based instruction is relatively expensive and is, therefore, often only available to a trainee in a specially equipped training room. As a result, the trainee must still leave his/her work site (i.e., desk, workstation, etc.) to perform training. Also, because a company may only have one specially equipped training room, the trainee generally must schedule use of the room or attend a scheduled satellite-based training session at time. Some companies have attempted to overcome this scheduling difficulty by recording the satellite-based training sessions on videotape for later playback. Unfortunately though, the use of videotape does not alleviate the need for a trainee to leave his/her workstation in order to travel to a specially equipped training room to view the videotape.

With regard to the profession ranks, LawyersLearn.Com, Inc. is among a few CLE providers currently addressing the need for online training and education for busy legal professionals. But the legal community is not alone when it comes to training and educational needs. The medical,

financial and technical professions also have a need for continuing education typically delivered through live training seminars, but which could be fulfilled through alternative, remote means.

Computers have become pervasive in all aspects of the business and educational worlds. Computers allow for the generation, storage, retrieval, and interaction with data in useful ways. For example, business uses allow for large amounts of data to be correlated together in the form of databases or spread sheets that allow a user to categorize and view relationships more rapid than was previously possible without the aid of the computer. Computers have also allowed for the dissemination of information either to limited groups or to large audiences via such communication channels as local area networks (LANs), wide area networks (WANs), and the Internet. Within this transmission of information, multimedia presentations have expanded to broaden the information dissemination and training opportunities available over LANs, WANs, and the Internet. The Internet has also provided interactivity where an Internet user is able to browse among various web sites for information. Upon finding a site of interest to the user, that site at times is able to glean information from the user that would be helpful for the web provider in a commercial or social context.

Hand held computing devices (i.e., hereinafter referred to as "hand held devices" or "handheld devices") are becoming increasingly popular for storing and maintaining information. One of the first major advances in handheld mobile computer technology was the Personal Digital Assistant (PDA). A PDA allows a user to access computer related information, yet it can fit into the palm of the user's hand. Utilizing a PDA a user can organize personal affairs, write notes, calculate equations, and record contact numbers in an address book. In addition, PDA's are usually capable of interfacing with a desktop computer, typically through a wired connection. The connection allows the PDA to download information and upload information, with the desktop computer. Later developments have given the PDA wireless capabilities. Wireless capabilities allow PDAs to remotely interact with other PDA's/computers that are not physically connected to the PDA.

Although PDA's may be connected to a desktop personal computer or other PDA's via infrared, direct wire, or wireless communication links, PDA's and similar hand held devices can also be linked remotely to networks such as the Internet via local wireless resources, such as RF broadcasts or through available wireless communications techniques.

The most advanced data- and video-enabled wireless communication devices currently available in the marketplace take the form of a PDA (e.g., Palm Pilot™, Handspring Visor™, and Windows CE compatible hand held computers, such as the iPAQ™). Unlike personal computers, which are general-purpose devices geared toward refining and processing information, PDAs are designed to capture, store and display information originating from various sources. Additionally, while a certain level of skill is required to use a personal computer effectively, PDAs are designed with the novice and non-computer user in mind.

The present inventor has recognized the convenience that online training and education is bringing to busy workers and professional since the advent of the Internet. The present inventor, however, has also recognized that vast improvements in wireless technology can further enhance current offerings in online education and current training applications that are primarily focused on a "connected" or "wired" world, but physically connected systems and training application will also continue to experience an explosion of



growth and improvement as more people begin to fully realize to positive impact that data networks have on everyday life.

The present inventor has realized that, what is needed in the training field is an interactive process that enables wireless education, instruction and/or professional development via portable, wireless handheld computer systems. The current invention enables users of hand held computers wirelessly coupled to a network (e.g., Internet) to engage in training (e.g., via a multimedia presentation), be evaluated on the understanding gained by the user after the training (e.g., interactive questioning), and allow for reporting (e.g., certification of course completion) of the results of a user's activity and evaluation to a course administrator. Training data can also be used to verify, evaluate, and enhance training, course, student and/or teacher performance and/or development. Training data can also be used for not only for professional or technical development, but could also be used as credit towards certification or even college credit. The present inventor has therefore developed new methods and systems for providing and managing the provision to and execution of training by users via handheld wireless devices as well as improvements for use of fixed, networked computers (wired devices) already deployed and familiar in the field of online education and training.

## SUMMARY OF THE INVENTION

Use of the word "training" throughout the rest of this document should not be interpreted as limitation to the applicable scope of the present invention. Although the present invention is related to methods and systems for electronically providing education, instruction and/or training to end users, "training" will be used herein primarily to describe all forms of education, instruction and training that the present invention can broadly apply.

The ability to obtain information from various users of a training system and report that information back to, for example, a supervisor, an instructor (such as a teacher or professor), principal, administrator, regulatory or accrediting body, or employer of the trainee, in a meaningful and helpful manner for evaluation review of the trainee's understanding of the subject matter has been lacking in the art of networked computer-based training until most recently. Further, the supervisor of many users may also be interested in knowing more about how long users took to review the information, how the users performed in the evaluation, what level of interaction users had with the training, how the collective group or groups of trainers are doing, and so forth.

It is an aspect of the present invention to provide improved methods and systems for providing and managing training through electronic networks to remote computers.

It is another aspect of the present invention provides improved methods and systems for providing and managing training through electronic networks to hand held devices.

It is another aspect of the present invention that training be provided through an electronic network to hand held devices such as wireless PDAs, mobile phones and pagers.

It is another aspect of the present invention to provide methods and systems for users to receive training through hand held devices.

It is another aspect of the present invention to provide methods and systems for users to receive training through a network at a hand held device.

It is another aspect of the present invention to provide methods and systems for receiving training through an electronic network for completion on a wireless device.

It is another aspect of the present invention to provide methods and systems for receiving training through an electronic network for completion on a wireless device and for recording completed instruction and training through a network from a wireless device.

It is another aspect of the present invention to provide methods and systems for registering and authenticating users/trainees, and receiving and authenticating completed training from a users/trainees of remote devices, such as hand held devices, authentication occurring through an electronic data network.

It is another aspect of the present invention to provide methods and systems for authenticating completed training received from a hand held device and transmitted through an electronic network by verifying the identification of users.

It is another aspect of the present invention to provide methods and systems for authenticating completed training received from users of hand held device and transmitted through an electronic data network by verifying the identification of users using biometric authentication means.

It is another aspect of the present invention to provide methods and systems for certifying training as successfully completed through a hand held device by sending training status and trainee information including, training completion results, student/instructor comments, certifications to trainees and third parties such as training/regulatory authorities and employers.

It is another aspect of the present invention to provide methods and systems for certifying training as successfully being completed through a hand held device by sending training completion results to trainees and third parties such as training regulatory authorities and employers via electronic means which can include e-mail receipt.

It is another aspect of the present invention to provide methods and systems for automatic generation of paper-based communication (e.g., letter/certificate) for completed training, which can be provided to trainees and third parties associated with trainees.

It is another aspect of the present invention to provide methods and systems for certifying training as successfully completed by a user through a hand held device by sending training completion results to the user through the hand held device.

It is another aspect of the present invention to provide methods and systems for certifying training as successfully being completed through a hand held device by sending training completion results to the hand held device user via electronic means that can include e-mail receipt, and automatic generation of paper-based communication (e.g., letter/certificate).

It is another aspect of the present invention to provide methods and systems for providing continuing legal education instruction through electronic networks to wireless hand held devices and their respective users.

The above and other aspects of the invention are achieved as will now be further described.

## BRIEF DESCRIPTION OF THE DRAWINGS

The novel features believed characteristic of this invention are set forth in the appended claims. The invention itself, however, as well as a preferred mode of use, further objects, and advantages thereof, will best be understood by reference to the following detailed description of an illustrative embodiment when read in conjunction with the accompanying drawings, wherein:

FIG. **1** depicts a block diagram illustrating components of a hand held device in which embodiments of the present invention may be implemented;

FIG. **2** illustrates a pictorial representation of a hand held device, which may be utilized to implement embodiments of the present invention;

FIG. **3** depicts a pictorial representation of a hand held device adapted for receiving a module in accordance with embodiments of the present invention;

FIG. **4** illustrates a diagram depicting attributes of a wireless network that may be utilized in accordance with embodiments of the present invention;

FIG. **5** illustrates communication equipment useful for carrying out network-based training systems and methods in accordance with the present invention;

FIG. **6** illustrates a flow chart for a method of granting access to the instructional segments;

FIG. **7** illustrates a flow chart of training sequences using a handheld device in accordance with methods of the present invention;

FIG. **8** illustrates reporting and certifying methods in accordance with the present invention;

FIG. **9** illustrate a sample image of a segment screen that includes a video window, where video is streamed for the user's review, as well as slide window, where text or still images are presented to the user;

FIG. **10** illustrates systems for authenticating training service users over networks;

FIG. **11** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **12** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **13** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **14**A illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **14**B illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **15** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **16** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **17** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **18** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **19** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **20** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **21** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **22** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **23** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **24** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **25** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **26** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **27** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **28** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **29** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **30** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **31** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **32** illustrates screen shots that are representative of multimedia content that can be associated with methods for carrying of the present invention;

FIG. **33** illustrates screen shots that are representative of multimedia content that is associated with a method and system for carrying of the present invention;

FIG. **34** illustrates screen shots that are representative of multimedia content that is associated with a method and system for carrying of the present invention;

FIG. **35** illustrates screen shots that are representative of multimedia content that is associated with a method and system for carrying of the present invention; and

FIG. **36** illustrates screen shots that are representative of multimedia content that is associated with a method and system for carrying of the present invention.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

The following description is presented to enable persons skilled in the art to make and use the invention, and is provided in the context of particular applications and its requirements. Various modifications to the disclosed embodiments will be readily apparent to those skilled in the art, and the general principles defined herein may be applied to other embodiments and applications without departing from the spirit and scope of the present invention.

Thus, the present invention is not intended to be limited to the embodiments shown, but is to be accorded the widest scope consistent with principles and features disclosed herein. Although preferred embodiments of the present invention are described herein, those skilled in the art can appreciate that a number of varying embodiments may be implemented in accordance with the present invention.

### Training Systems

In accordance with aspects of the present invention, new methods and systems for providing training through/over networks to remote computer/handheld device users will now be described in detail. Training can be provided through networks to computers and hand held devices. Handheld devices can include PDAs, pagers, and wireless phones. Referring to FIG. **1**, a schematic diagram illustrating a general hardware configuration of a hand held device **11** in accordance with an embodiment of the present invention is provided. Those skilled in the art can appreciate, however, that other hardware configurations with less or more hardware and/or modules may be utilized in carrying out the methods and systems of the present invention as will be further described herein. Those skilled in the art can also appreciate that many components found in handheld computing devices are also commonly found in desktop computing systems, therefore desktop computing system should be considered to be adequately disclosed if associated with any aspect of the present invention related to wired communication and/or electronic networks.

CPU **10** of hand held device **11** performs as a main controller operating under the control of a CPU **10**. CPU **10** may be configured, for example, as at least a 16-bit microprocessor. External pins of CPU **10** are generally coupled to at least one internal bus **26** so that it may be interconnected to respective components. A SRAM **24** can be configured as a writeable memory that does not require a refresh operation and can be generally utilized as a working area of CPU **10**. SRAM (Static RAM) is generally a form of semiconductor memory (RAM) based on a logic circuit known as a flip-flop, which retains information as long as there is enough power to run the device. Font ROM **22** can be configured as a read only memory for storing character images (e.g., font) displayable on a display **18**. Examples of types of displays that may be utilized in accordance with display **18** include a TFT active matrix display, an illuminated LCD (Liquid Crystal Display), or other small-scale displays being developed.

CPU **10** of the preferred embodiment drives a display **18**, and can utilize, among other media, font images from Font ROM **22**, and images transmitted as data through wireless unit **17** and processed by image-processing module **35**. An EPROM **20** can be configured as a read only memory that is generally erasable under certain conditions and can be utilized for permanently storing control codes for operating respective hardware components and security data, such as a serial number.

An IR controller **14** can be provided with hand held device **11** and configured as a dedicated controller for processing infrared codes transmitted/received by an IR transceiver **16** and for capturing the same as computer data. Alternatively or additionally, wireless unit **17** can generally be configured as a dedicated controller and transceiver for processing wireless data transmitted from and to a wireless remote radio frequency communications network. Note that wireless unit **17** can be implemented as a separate module or cartridge, such as illustrated in FIG. **3**. Wireless unit **17** can thus also b referred to in the art as a wireless "module" or "cartridge."

Port **12** can be connected to CPU **10** and can be temporarily attached, for example, to a docking station to transmit information to and from hand held device **11** to other devices such as personal computers or electronic kiosk devices, and so forth, and can be used in order to download training course material. Port **12** can also be configured, for example, to link with a modem, cradle or docking station, well known in the art to permit network devices, personal computers or other computing devices to communicate with a hand held device **11**.

User controls **32** permit a user to enter data to hand held device **11** and initiate particular processing operations via

CPU **10**. A user interface **33** may be linked to user controls **32** to permit a user to access and manipulate hand held device **11** for a particular purpose, such as, for example, viewing images on display **18**. Those skilled in the art will appreciate that user interface **33** can be implemented as a touch screen user interface, as indicated by the dashed lines linking display **18** with user interface **33**. In addition, CPU **10** may cause a sound generator **28** to generate sounds of predetermined frequencies from a speaker **30**. Speaker **30** may be utilized to produce music and other audio information associated with video data transmitted to hand held device **11** from a training provider.

Those skilled in the art can appreciate that additional electronic circuits or the like other than, or in addition to, those illustrated in FIG. **1** may be used to construct hand held device **11**. Such components, however, are not described in the present specification, because many aspects of them are well known in the art. In addition, those skilled in the art will appreciate that hand held device **11** can be implemented as a specific type of a hand held device, such as a Personal Digital Assistant (PDA), paging device, WAP-enabled mobile phone, and other wireless, data-enabled hand held computing devices well known in the art.

Given the teaching of various embodiments of the present invention, it should be appreciated that a hand held device **11** can be configured to permit images, similar to television broadcast images, to be displayed on display **18** for a user to view. Hand held device **35** thus includes an image-processing unit **35** for processing images transmitted as data to hand held device **11** through wireless unit **17**. A tuner unit **34**, implemented as either a single tuner or a plurality of tuners, may be linked through internal bus **26** to CPU **10**. Additionally, a security unit **36** may be utilized to process proper security codes to thereby ensure that data transferred to and from hand held device **11** may be secure and/or permitted.

Security unit **36** may be implemented as an optional feature of hand held device **11**. Security unit **36** can also be configured with software, e.g., algorithm routines or subroutines, that are processed by CPU **10**, and which prevent wireless data from being transmitted/received from hand held device **11** beyond a particular frequency range, outside of a particular geographical area associated with a local wireless network, or absent authorization codes or unique signatures (e.g., decryption, encryption, coding, decoding, biometrics and so forth). Note that security unit **36** can be implemented as a separate security module, such as, for example, a smart card, or cartridge. An example of a module, which may be implemented in accordance with the methods and systems of the present invention, is illustrated in FIG. **3**. A security module of this type may be utilized for securing data transmitted from or to a hand held device such as, for example, hand held device **11**.

Hand held device **11** can thus be configured with both wireless and wireline capabilities, depending on the needs and requirements of a manufacturer or customer. Such wireless capabilities include features such as those found in cellular telephone units, in accordance with carrying out embodiments of the present invention. Current examples of hand held devices that can be utilized in accordance with the methods and systems of the present invention include the "PalmPilot™" PDA, manufactured and sold by Palm Computing, the Handspring Visor™, Window CE™ compatible devices, RIM™ Blackberry-family paging devices, Motorola paging devices, and the Symbol™ SPT-family of PDA-type organizer devices. Such hand held devices are mentioned herein for illustrative purposes only and are not considered limiting features of the present invention. Hand held devices which may also be implemented in accordance with the methods and systems of the present invention include hand held devices, such as cellular telephones having viewable display screens for the display of data transmitted through wireless connections networks.

Those skilled in the art can appreciate that although hand held device **11** is generally illustrated in FIG. **1**, hand held device **11** can be implemented as a wireless application protocol (WAP) web-enabled cellular hand held device, such as a PDA, wireless phone, pager or a combination thereof. Hand held device **11** can also be configured with features of combination cellular telephone/PDA devices. One recent example of such a device is the Handspring™ PDA and associated cellular phone attachment module, which is manufactured and sold by Handspring™ Inc. Other such devices include the Palm-Motorola phone, which permits users to access e-mail and store calendars and contact databases.

Regardless of the type of hand held device implemented, it is anticipated that such hand held devices will be adapted to receive and process data via CPU **10** and image-processing unit **35** for ultimate display as moving images on display unit **18**, in accordance with the present invention. Image-processing unit **35** may include image-processing routines, subroutines, software modules, associated protocols (e.g., XML, HTML, XHTML, CSS WAP etc.), and so forth, in support of and/or to perform data-/image-processing operations. Hand held device **11** thus merely represents an exemplary illustration of one possible hand held device that may be implemented in accordance with the methods and systems of the present invention. Such a hand held device may be configured according to a wide variety of configurations. Hand held device **11** is thus not a limiting feature of the present invention. Training can thus be provided in accordance with methods and systems of the present invention through a wireless hand held device, such as hand held device **11**.

FIG. **2** illustrates a pictorial representation of a hand held device **40** that can be utilized to implement preferred embodiments of the present invention. Hand held device **40** includes a display screen **42**, which is generally analogous to display **18** of FIG. **1**. Multimedia presentations or digital data may be displayed on display screen **42** for a user to view. User controls **44** can permit a user to select and/or manipulate images or text displayed on display screen **42**. User controls **44** of FIG. **2** are generally analogous to user controls **32** of FIG. **1**. A touch screen user interface may be further configured on the display screen **42** with hand held device **40** to permit a user to manipulate images/text displayed on display screen **42**.

FIG. **3** depicts a pictorial representation of a hand held device **56** adapted for receiving a module **50** (or also "cartridge"), in accordance with preferred embodiments of the present invention. Hand held device **56** of FIG. **3** is generally analogous to hand held device **40** of FIG. **2**, the only difference being that hand held device **56** may be adapted to receive a module/cartridge **50** that can permit it to function according to specific hardware, codes, authorizations and/or instructions contained in a memory location (e.g., a computer chip or magnetic strip) within the module **50**. Module **50** can be configured as a smart card, well known in the art. Note that as utilized herein, the term "module" may refer to a physical module, such as a cartridge. The term "module" may also refer to a software module composed of routines or subroutines that perform a particular function. Those skilled in the art can appreciate the meaning of the term module is based on the context in

which the term is utilized and environment being described. Thus, module **50** as illustrated can be generally configured as a physical cartridge or smart card. The term "module" as utilized herein may also refer to a software module, depending on the context of the discussion thereof.

To illustrate the use of a physical module, such as module **50**, assume that a user may possess several such physical modules or cartridges. One module, when inserted into hand held device FIG. **3** can instruct hand held device **50** to function as a standard PDA, such as a handspring Visor™ device. Another module, when inserted into hand held device FIG. **3**, may instruct hand held device **56** to function as a wireless hand held device for receiving and implementing training for a user through the wireless hand held device.

Those skilled in the art can thus appreciate that hand, held device **56** can be adapted to receive and cooperate with module **50**. Additionally, hand held device **56** includes a display screen **52** that is generally analogous to display screen **42** of FIG. **2** and display **18** of FIG. **1**. Hand held device **56** also includes user controls **54** that are generally analogous to user controls **44** of FIG. **2** and user controls **32** of FIG. **1**. Hand held device **56** of FIG. **3** is generally analogous to hand held device **11** of FIG. **1**. Thus, hand held device **56** can also implement touch screen capabilities through a touch screen user interface integrated with display screen **52**.

Assuming module **50** is implemented as a smart card instead of a cartridge to provide receiver and/or securing capabilities (e.g., encryption, decryption, coding, decoding, biometric authentication, etc.), it is anticipated that similar features can be implemented in accordance with a smart card to insure that hand held device **56** includes touch screen user interface and video viewing capabilities. Most smart cards are generally known in the art as credit card sized plastic cards with an embedded computer chip. The chip can either be a microprocessor with internal memory or a memory chip with non-programmable logic. The chip connection can be configured via direct physical contact or remotely through a contactless electromagnetic interface.

Smart cards may be generally configured as either a contact or contactless smart card, or a combination thereof. A contact smart card requires insertion into a smart card reader (e.g., contained within hand held device **56**) with a direct connection to, for example, a conductive micromodule on the surface of the card. Such a micromodule may be generally gold plated. Transmission of commands, data, and card status takes place through such physical contact points.

A contactless card requires only close proximity to a reader. Both the reader and the card may be implemented with antenna means providing a contactless link that permits the devices to communicate with one another. Contactless cards can also maintain internal chip power or an electromagnetic signal (e.g., RF tagging technology). Two additional categories of smart cards, well known in the art, which are based on contact and contactless cards are the so-called Combi cards and Hybrid cards.

A Hybrid card generally may be equipped with two chips, each with a respective contact and contactless interface. The two chips are not connected, but for many applications, this Hybrid serves the needs of consumers and card issuers. The Combi card may be generally based on a single chip and can be generally configured with both a contact and contactless interface.

Chips utilized in such smart cards are generally based on microprocessor chips or memory chips. Smart cards based on memory chips depend on the security of the card reader for their processing and can be utilized when low to medium



security requirements. A microprocessor chip can add, delete and otherwise manipulate information in its memory. Microprocessor-based memory cards typically contain microprocessor chips with 8, 16, and 32 bit architectures.

Educational instruction and training can be received by and for completion at wireless devices through electronic networks, which are generally well known in the art. FIG. **4** illustrates a communication diagram **170** depicting various attributes that can be associated with wireless network **152** communication and that can be utilized in accordance with preferred embodiments of the present invention as applied to handheld devices. A wireless network **152** as illustrated in FIG. **4** can thus be configured as a variety of possible wireless communication systems. Thus, entity diagram **170** illustrates attributes of a wireless network **152**, which may or may not be exclusive of one another.

Communication and Data Protocols

Those skilled in the art can appreciate that a variety of possible wireless communications and networking configurations can be utilized to implement a wireless network **152**. Wireless network **152** can be, for example, implemented according to a variety of protocols, including TCP/IP, cellular, Bluetooth, and 802.11 RF or direct IR communications. Wireless network **152** can be implemented as a single network type or a network based on a combination of network types (e.g., Internet, PSTN, LAN, WAN, VPN, etc.).

Wireless network **152** may be configured with teachings/aspects of CDPD (Cellular Digital Packet Data) **154** networks well known in the networking arts. CDPD network **154** is illustrated in FIG. **4**. CDPD may be configured as a TCP/IP based technology that supports Point-to-Point (PPP) or Serial Line Internet Protocol (SLIP) wireless connections to mobile devices, such as the hand held devices described and illustrated herein. Mobility and/or cellular service are generally available throughout the world from major service providers. Data can be transferred utilizing CDPD protocols.

Current restrictions of CDPD are not meant to limit the range or implementation of the methods and systems described herein, but are described herein for illustrative purposes only. It is anticipated that CDPD will be continually developed, and that such new developments can be implemented in accordance with the present invention.

Wireless network **152** may also be configured with teachings/aspects of a Personal Area Network **156** such as 802.11 or Bluetooth, as described herein. Bluetooth was adopted by a consortium of wireless equipment manufacturers referred to at the Bluetooth Special Interest Group (BSIG), and has emerged as a global standard for low cost wireless data and voice communication. Current specifications for this standard call for a 2.4 GHz ISM frequency band. Bluetooth technology is generally based on a short-range radio transmitter/receiver built into small application specific circuits (ASICS, DSPs) and embedded into support devices, such as the hand held devices described and illustrated herein.

The Bluetooth standard has permitted up to 100 mw of power, which can increase the range to 100 M. In addition, Bluetooth can support several data channels. Utilizing short data packets and frequency hopping of up to 1600 hops per second, Bluetooth is a wireless technology that can be utilized to enable the implementation of the methods and systems described herein. Current restrictions of Bluetooth are not meant to limit the range or implementation of the present invention, but are described herein for illustrative purposes only. It is anticipated Bluetooth will be continually

developed, and that such new developments can be implemented in accordance with the present invention.

Wireless network **152** may also be configured utilizing teachings/aspects of GSM network **158**. GSM (Global System for Mobile Communication) and PCS (Personal Communications Systems) networks, both well known in the telecommunications arts, generally operate in the 800 MHz, 900 MHz, and 1900 MHz range. PCS initiates narrowband digital communications in the 900 MHz range for paging, and broadband digital communications in the 1900 MHz band for cellular telephone service. In the United States, PCS 1900 is generally equivalent to GSM 1900. GSM operates in the 900 MHz, 1800–1900 MHz frequency bands, while GSM 1800 is widely utilized throughout Europe and many other parts of the world.

In the United States, GSM 1900 is generally equivalent to PCS 1900, thereby enabling the compatibility of these two types of networks. Current restrictions of GSM and PCS are not meant to limit the range or implementation of the present invention, but are described herein for illustrative purposes only. It is anticipated that GSM and PCS will be continually developed, and that aspects of such new developments can be implemented in accordance with the present invention.

Wireless network **152** may also utilize teachings/aspects of GPRS network **160**. GPRS technology, well-known in the telecommunications arts, bridges the gap between current wireless technologies and the so-called "next generation" of wireless technologies referred to frequently as the third-generation or 3G wireless technologies. GPRS is generally implemented as a packet-data transmission network that can provide data transfer rates up to 115 Kbps. GPRS can be implemented with CDMA and TDMA technology and supports X.25 and IP communications protocols, all well known in the telecommunications arts. GPRS also enables features, such as Voice over IP (VoIP) and multimedia services. Current restrictions of GPRS are not meant to limit the range or implementation of the present invention, but are described herein for illustrative purposes only. It is anticipated that GPRS will be continually developed and that such new developments can be implemented in accordance with the present invention.

Wireless network **152** may also be implemented utilizing teaching/aspects of a CDMA network **162** or CDMA networks. CDMA (Code Division Multiple Access) is a protocol standard based on IS-95 CDMA, also referred to frequently in the telecommunications arts as CDMA-1. IS-95 CDMA is generally configured as a digital wireless network that defines how a single channel can be segmented into multiple channels utilizing a pseudo-random signal (or code) to identify information associated with each user. Because CDMA networks spread each call over more than 4.4 trillion channels across the entire frequency band, it is much more immune to interference than most other wireless networks and generally can support more users per channel.

Currently, CDMA can support data at speeds up to 14.4 Kbps. Wireless network **152** may also be configured with a form of CDMA technology known as wideband CDMA (W-CDMA). Wideband CDMA may be also referred to as CDMA 2000 in North America. W-CDMA can be utilized to increase transfer rates utilizing multiple 1.25 MHz cellular channels. Current restrictions of CDMA and W-CDMA are not meant to limit the range or implementation of the present invention, but are described herein for illustrative purposes only. It is anticipated that CDMA and W-CDMA will be continually developed and that such new developments can be implemented in accordance with the present invention.

Wireless network **152** can also be implemented utilizing teachings/aspects of paging network **164**. Such paging networks, well known in the telecommunications arts, can be implemented in accordance with the present invention to enable transmission or receipt of data over the TME/X protocol, also well known in the telecommunications arts. Such a protocol enables notification in messaging and two-way data coverage utilizing satellite technology and a network of base stations geographically located throughout a particular geographical region. Paging network **162** can be configured to process enhanced 2-way messaging applications.

Unified messaging solutions can be utilized in accordance with wireless network **152** to permit carriers and Internet service providers to manage customer e-mail, voice messages and fax images and can facilitate delivery of these communications to PDAs, telephony devices, pagers, personal computers and other capable information retrieval devices, wired or wireless.

Current restrictions of such paging networks are not meant to limit the range or implementation of the present invention, but are described herein for illustrative purposes only. It is anticipated that such paging networks, including those based on the TME/X protocol, will be continually developed and that such new developments can be implemented in accordance with the present invention.

Wireless network **152** may also be configured utilizing teachings/aspects of TDMA networks **166**. TDMA (Time Division Multiple Access) is a telecommunications network utilized to separate multiple conversation transmissions over a finite frequency allocation of through-the-air bandwidth. TDMA can be utilized in accordance with the present invention to allocate a discrete amount of frequency bandwidth to each user in a TDMA network to permit many simultaneous conversations or transmission of data. Each user may be assigned a specific timeslot for transmission. A digital cellular communications system that utilizes TDMA typically assigns 10 timeslots for each frequency channel.

A hand held device operating in association with a TDMA network sends bursts or packets of information during each timeslot. The receiving equipment into the original voice or data/information components then reassembles such packets of information. Current restrictions of such TDMA networks are not meant to limit the range or implementation of the present invention, but are described herein for illustrative purposes only. It is anticipated that TDMA networks will be continually developed and that such new developments can be implemented in accordance with the present invention.

Wireless network **152** may also be configured utilizing teachings/aspects of Wireless Intelligent Networks (WINs) **168**. WINs are generally known as the architecture of the wireless switched network that allows carriers to provide enhanced and customized services for mobile telephones. Intelligent wireless networks generally include the use of mobile switching centers (MSCs) having access to network servers and databases such as Home Location Registers (HLRs) and Visiting Location Registers (VLRs), for providing applications and data to networks, service providers and service subscribers (wireless device users).

Local number portability allows wireless subscribers to make and receive calls anywhere—regardless of their local calling area. Roaming subscribers are also able to receive more services, such as call waiting, three-way calling and call forwarding. A HLR is generally a database that contains semipermanent mobile subscriber (wireless device user) information for wireless carriers' entire subscriber base.

A useful aspect of WINs for the present invention is enabling the maintenance and use of customer profiles within an HLR/VLR-type database. HLR subscriber information as used in WINs includes identity, service subscription information, location information (the identity of the currently serving VLR to enable routing of communications), service restrictions and supplementary services/information. HLRs handle SS7 transactions in cooperation with Mobile Switching Centers and VLR nodes, which request information from the HLR or update the information contained within the HLR. The HLR also initiates transactions with VLRs to complete incoming calls and update subscriber data. Traditional wireless network design is generally based on the utilization of a single HLR for each wireless network, but growth considerations are prompting carriers to consider multiple HLR topologies.

The VLR may also be configured as a database that contains temporary information concerning the mobile subscribers currently located in a given MSC serving area, but whose HLR may be elsewhere. When a mobile subscriber roams away from the HLR location into a remote location, SS7 messages are used to obtain information about the subscriber from the HLR, and to create a temporary record for the subscriber in the VLR.

Signaling System No. 7 (referred to as SS7 or C7) is a global standard for telecommunications. In the past the SS7 standard has defined the procedures and protocol by which network elements in the public switched telephone network (PSTN) exchange information over a digital signaling network to effect wireless and wireline call setup, routing, control, services, enhanced features and secure communications.

Improved operating systems and protocols allow Graphical User Interfaces (GUIs) to provide an environment that displays user options (e.g., graphical symbols, icons or photographs) on a wireless device's screen. Extensible Markup Language ("XML") is generally a currently available standard that performs as a universal language for data, making documents more interchangeable. XML allows information to be used in a variety of formats for different devices, including PCs, PDAs and web-enabled mobile phones.

XML enables documents to be exchanged even where the documents were created and/or are generally used by different software applications. XML may effectively enable one system to translate what another system sends. As a result of data transfer improvements, wireless device GUIs can be utilized in accordance with a hand held device and wireless network **152**, whether configured as a paging network or another network type, to render images on the hand held device that closely represent the imaging capabilities available on desktop computing devices.

Referring to FIG. **5**, a high-level illustration communication equipment useful for carrying out network-based training systems and methods in accordance with present invention. Enterprise equipment **180** used by the training/education provider can include a server **183** and database **185** that can be connected to a network **200** via network equipment **190** (e.g., routers, modems, switches, etc.). User equipment such as a PC **191** or handheld wireless device **195** can be connected a user to network **200** via, for example, a wired **193** or wireless **197** communication equipment connection (e.g., 802.11, WAP, GSM, PCS, CDMA, GPRS, CDPD, DSL, ISDN, T-1/T-3, satellite, or the like). A handheld device **196** can be connected to, or otherwise access, networks through a PC **191** via a docking station **198**. Furthermore, network **200** can provide access to third party training media **186** from information servers/providers **188** accessible through electronic networks (e.g., the Internet).

Server **183** can control access to training resources that are stored within a database **185** and can organize and manage the feedback or information received from the users, to be reported back to the appropriate parties (e.g., supervisors, regulatory entities such a State Bars). A user can utilize a web browser, such as Netscape Navigator™, Microsoft Internet Explorer™, or other web browsers and micro browsers known to those skilled in the art, to access training and associated information. The training and materials can be downloaded through the network **200** to the user's portable equipment in a multimedia form that can include streaming video as well as audio, slide shows and text portions. It is well known that streaming video programs can be utilized as a plug-ins to the web browser to allow viewing of streaming video. Examples of functional streaming video applets include RealPlayer™ provided by RealNetworks, as well as other streaming video products such as Window Media™ Player, provided by Microsoft, Inc. and QuickTime™ Player, provided by Apple Corporation.

With streaming video, training segments can be provided to or otherwise streamed across a communications channel, i.e. the Internet, on demand to end users. Training segments can also be stored on a proxy cache server for non-internet access should the net connection be disconnected as well as to increase bandwidth.

General Training Methods

FIG. **6** illustrates a block diagram of a flow chart illustrating the method of granting access to training. As shown in block **610**, users can gain access to the authorized training programs following a login and password sequence or through biometric authentication means. Methods of granting an authorized supervisor of one or more users access to user(s) records relating to information viewed and accessed by the user(s) are important in order to maintain data and program integrity. Once the training system has the user login to access the system. The login is verified before presenting instructional titles for view as shown in block **615**. Once logged on, user is presented with and can choose from several training courses and other related materials as shown in block **620**. The user can select a given title with an appropriate communications format (e.g., baud/bit rate) for viewing as shown in block **625**, and the program can be downloaded or begin as shown in block **630**. Timing of the training program can begin simultaneously with the training programs downloaded or stream (when streaming is involved).

A login procedure is generally provided for the user where the user is asked to enter a password, login handle, biometric sample, or any combination of verification/authentication data. GUI representations of login screens and password fields are well known in the art. The user generally clicks on the SUBMIT button after filling in their information and the information is submitted to the server. The users equipment and the server performs a handshake operation to verify the access rights of the user based on the appropriate information provided by the user.

The server can grant a user access to training through a title page (typically in HTML format) that can allow the user to select among the instructional segments or courses provided for use. Other optional features that can be provided to users include joining a chat discussion on the subject matter of a given course as well as providing a threaded discussion group for review and correspondence among fellow users.

The course titles or options shown on device screens may be accessed or activated by highlighting the desired section with the cursor and/or clicking on underlined (e.g., HTML) lettering with cursor manipulation device, typically a mouse or a touch screen tap. Active titles can be hyperlinks to licensed media, such as a video segment. Unlicensed, or public, media can also be shown, either as hypertext or as plain text. Further, the user can be shown the length of time required to view each course or segment as well as whether the user has viewed the course or segment and whether the course or segment has been completed, which includes the evaluation or testing portion following the completion of viewing the segment.

As described above, a user can select a course along with parameters that define the course by selecting a title, and can also select a communications means (e.g., streaming bit rate) for the program when applicable. For example, streaming bit rates depend upon the communications connection between the user and server. The user can inform the server what type of connection the user has and the server then optimizes the transfer of data based on the actual transfer rate established between the user and server. Of course the transfer rates can also be determined automatically during the connection protocol sequence used by the server and user's computer. Upon selection of a desired title, database/server begins transmitting information over the communications channel to the end user at an optimal or selected transfer rate.

The invention will now be described with the continuation from where the user accesses the initial presentation screen. FIG. **7** illustrates a block diagram of a flow chart illustrating training sequences using a handheld device. A user can makes a training selection upon verification of the user by the system, as shown in FIG. **6**. It can be assumed that the course has been successfully transferred to the device, or that an active communication channel has been set up. The course can begin, as shown at block **710**. Prior to the commencement of the instructional material, preliminary questions or content points (orientation) for the user to review can be provided **720**. This makes the user aware of what to observe during the presentation of the program. Additionally, the user can be given the option to print questions or points for review and awareness during the instruction portion of the presentation.

The handheld system can present questions and content points to the user at the beginning as well as during a course. The system (or test software) can also require a post test and final information from the user before course completion. Questions and content can be provided as an interactive session, or can be conducted with the handheld device computing assets alone. Once the end of a course is reached, the user can review the material and complete post test questions, which may be in essay or multiple-choice format, or a combination of the two. The questions are then submitted for evaluation as shown in block **730**. The information is received by the server **740** and saved for further use and/or evaluation.

Training sessions are accessible by more than one user as shown in FIG. **6**. More than one instructional leader or administrator can also access administrative sections of the enterprise system, after logging into the system. Administrators can use reports after performing a login and verification similar to that taught in FIG. **6**, for access by trainees. The administrator can select reporting/certification or administrative sections of the system, based on authorization level. Reporting and certification selections can allow for access and control to test records and course completion certificates associated with users/trainees. The administrative section can allow for the manipulation (addition or subtraction) of training material and/or accounting records. After making a selection, a data summary is provided for a user's within the selected group. Assuming, for example, that an administrator selects one of the user's files for review of the user's exam. The administrator can provide feedback to the user and/or verify the user's completion of the selected instructional segment.

Referring to FIG. **8**, illustrated is a flow diagram for reporting and certifying methods in accordance with the present invention. Completed courses and information related to training or the user can be received from a user via networks, as shown in block **810**. The user can be authenticated prior to further processing of received information as shown in block **820**. Once information is received, it can be saved and/or evaluated as shown in block **830** The server can automatically determine as shown in decision block **840**, whether the course is satisfactorily completed or not. If not, the user can be notified as shown in block **850**. Of course it should be appreciated that other parties associated with the user can also be notified if relevant (e.g., an employer). If the course was satisfactorily completed, the user's results can be certified, reported or otherwise recorded as shown in block **860**. Reporting can be generated in the form of emails sent to trainees and associated third parties (e.g., employers) regarding, for example, the trainees scores, class standing, completion status, etc. Reporting can include, for example, notifying the trainee of his or her results or that the user must review the material and complete the associated exam. An administrator can also use the system to assist in the remote evaluation of a user's understanding of the viewed materials, and to provide a report/information back to the user's or the user's supervisors in accordance with the principles of the present invention. It should also be appreciated that the system can be programmed to automatically score, track, report, and certify user activities. Certification and reporting can be directly to a user via email and/or to a user's supervisor, company, and/or regulatory/governing body (e.g., state bars or medical boards).

Multimedia

Referring to FIG. **9**, an illustration of an example image (e.g., screen shot) of a segment screen **910** that can be displayed on hand held devices. The screen shot includes a video window **912**, where video can be streamed for the user's review, as well as slide window **914** where text or still images can be presented to a user. A server **183** can stream training programs and information from databases **185** to the end user **191**, **195**, **196**, as shown in block FIG. **5**, where it can be displayed to the user in a format similar to that is illustrated in FIG. **9**. Still images such as the text box **914** can be provided in coordination with the streaming video portion **912** of the instructional segment. The still images can be displayed in window **914** along side streaming video shown in window **912**, using timing codes. Video controls **916** can allow the user to replay portions of the video, backtrack, pause, stop, or skip ahead as well as control the volume as needed. The timing of the video can be based on the URLs of the slides that are played, which can merely be one example of the timing that may be used. Another method to provide timing can be to cue the slides to the video, or even to be provided independently so the teacher or user can select the next slide when ready. Other navigational bars can allow a user to proceed to the NEXT screen **920** or go BACK **922** to the previous content/screen. Additional information regarding the displayed material, the example given being information on a particular professor, can be provided to the

user **930** after his/her selection **920** (e.g., selection via displayed hypertext associated with the selection using a user interface). The text and graphics of this example are otherwise self-explanatory.

Still images are an option that can supplement a training session or discussion as well as streaming video by highlighting important points in the instructional segment. Such points can include dates of interests, formulas relevant to the discussion, illustrative graphics, or lists of related matters for expanding understanding of a given subject, rules of law, medical principles and other supporting examples. Thus, after selecting a title, the instructional segment streams across the communications channel from the server to the user's computer. As the program begins to stream, a slide presentation can also be presented, which can be linked to the synchronized time code of the program and video. Instructions can also be provided to the user prior to the beginning of the video. The segment can contain questions that are presented at the end of the program, as well as questions that are featured at the beginning or during a training session in order to stimulate the viewer to be aware of specific strategies, theories, and applications. It should be appreciated that all instruction and supporting material can be provided in the form of a compressed data filed to the hand held device, rather than as streaming data segments requiring an active connection to a remote server. Such self-contained instruction delivery and use is generally only limited by the amount of memory available at the hand held device. Improvements in the hand held device and wireless communication fields should be anticipated, and will continue to enhance remote training systems and methods—in particular those where hand held devices are used.

Recording/Certifying/Reporting

As mentioned above, methods and systems for certifying successful instruction and training completed through a hand held device can be carried out by sending course/training completion results to training authorities and/or course participants. Certification can be provided via electronic means that can include e-mail receipt and/or automatic generation of paper-based communication (e.g., letter/certificate). Administrative reports can be generated based upon a user's accessing the instructional segments in accordance with the present invention. Reports can be used to provide feedback to instructional leaders or administrators that, in an example of a teacher participating in a teacher development and enhancement program, includes the identity of the faculty member accessing the interactive training segment module, the duration of each faculty members time on line, and the results of the comprehension test/activity at the end of each segment or module. The information can further include access dates and times, IP addresses of devices used by trainees, assignment completion, status and exam/assignment verification. Administrators at all levels can use this data to verify, evaluate, and enhance staff development throughout their organizations. For example, in the case where a teacher is providing instructional materials on-line for students, the teacher can receive evaluation reports that can include useful evaluation information. For example, a teacher would eventually like to know how long each student spent on-line viewing the instructional material and how long each individual student took to answer the comprehension exam at the end of the segment. This would allow the teacher to gauge which subjects and concepts the class as a whole is struggling with as well as what subjects each student comprehends or information can allow a teacher to customize feed back to students, which can help students understand instructional content lecture materials for subsequent material that may follow.



The feedback of the evaluation of the user's performance in answering the questions can be given via a direct email to a valid email addressed provided by the user or posted back to the user's personal access point entered via the password and login portion of the site. Of course, the results can be printed and mailed to the user as an option to provide the user with a validated hard copy. Once an instructional segment is completed, the user can be allowed to select another title to review or elect to log out of the system, thereby completing the instructional session. Furthermore, if a user fails to undertake training in a timely manner, reminders can be sent to the user via email, voice messaging, or a letter, to remind the user to complete the programs within the allotted time prescribed.

Security and Authentication

Referring to FIG. **10**, a system for authentication of a trainee is illustrated. A training Provider that can identify and/or authenticate authorized users of: access to provider systems; access to ongoing training; and the provision of completed training. Authorized users gain access to the system via a hand held device **1025**, and data is transmitted and received at the server **1005** through an electronic network **1010**. Authentication of training can be by username and password procedures known in the art. Training/trainee authentication can also be by use of biometric authentication means, such as a digital file **1030** taken at the handheld device **1025** via a biometric measuring device **1020** (e.g., fingerprint reader). With biometrics systems, a digital file **1030** representing the user biometric can be matched with a biometric template file **1015** stored at, or accessible by, the server **1005**. If the files match, the user is authenticated. Authentication can be used for authorizing all transactions, such as course ordering, and completed course submission.

A biometric identification mechanism **1020** eliminates the weakest link caused by the human factor. Biometric identification mechanisms, or biometric devices, utilize a scientific technique to identify a user based on compared measurements of unique personal characteristics. Biometric identification mechanisms include two basic categories of biometric measurements. The first category involves measuring a unique characteristic found on a user's body. This may include, but is not limited to, finger and hand geometry, retina and facial images, weight, DNA data and breath. The second category involves measuring a user's behavioral characteristics. This may include, but is not limited to, voice, typing stroke and signature. In general, anything that can be measured on a user that is unique can be used as a biometric measurement.

While anything that can be measured on a user that is unique can be used as a biometric measurement, the best biometric measurements to use for authentication purposes depend on the consistency over time of the biometric measured. For example, user weight is a biometric measurement. Because weight is a biometric measurement that fluctuates frequently for many people, it is not a desirable biometric measurement to use for authentication purposes.

The general process of using biometric identification mechanisms as an authentication mechanism is as follows. The user is prompted for a particular biometric measurement that is used by a biometric device to generate a value. The value gets stored in a template as stored biometric data. When the user wants to gain access to a resource that is protected by the biometric device, the user is prompted for

live biometric data. The live biometric data is matched with the stored biometric data. In reality, the live biometric data and the stored biometric data will never be exactly the same. Therefore, a user must come within some tolerance to pass the biometric device and gain access to the protected resources. As mentioned above, the biometric device utilizes a scientific technique to identify a user based on biometric measurements. The tolerance is typically predetermined by the vendor for the particular biometric device used.

A specific example of how biometric identification works can be illustrated by a typical fingerprint device. A fingerprint device measures the geometry of a fingerprint. First, a user is prompted for multiple samples of a fingerprint. For each sample, a number of characteristics or measurements are identified. Then, for all of the multiple samples, a number of common characteristics or measurements are identified. The common characteristics or measurements are processed through a unique algorithm that generates a unique template to store the biometric data. When a "live" fingerprint is presented for identification, it is processed through the same algorithm. If the output from the "live" process matches the stored biometric data within a certain tolerance, the user is considered to be authenticated and gains access to whichever resource the fingerprint device is protecting.

A specific example of how biometric identification works when behavioral measurements are involved can be illustrated by a typical signature device. Here, a user is prompted for multiple samples of a signature. For each sample, characteristics or measurements are identified. The characteristics or measurements include the pressure, sequence of events, direction, relative vectors and speed. One example of the sequence of events is to identify that when the user signed his or her signature, that "t" was crossed before "I" dotted. An example of direction is that the user crossed a "t" from right to left. Relative vectors may include the information that "F" is 2.1 the height of "e." Finally, speed recorded is the time it took the user to sign a signature from start to finish.

As with fingerprint devices, common characteristics or measurements are identified for the multiple samples. These common characteristics or measurements are processed through a unique algorithm that generates a unique template to store the biometric data. When a "live" signature is presented for identification, it is processed through the algorithm. If the output from the "live" process matches the stored biometric data within a certain predetermined tolerance, the user is considered to be authenticated.

The use of biometric identification mechanisms as a means for authentication eliminates the forgetful user or unauthorized user access problems can occur through the use of passwords, tokens or smart cards. Because biometric measurements involve either a unique characteristic found on a user's body (e.g., fingerprint) or a user's behavioral characteristics (e.g., signature), it is impossible for users to forget or lose the mechanism of authenticating themselves. Now, it is impossible for User B to "steal" the mechanism of authenticating User A to the enterprise. Likewise, the practices of users sharing passwords and "buddy punching" are eliminated.

While the use of biometric devices can conclusively authenticate a user, the inventor of the present invention recognize that methods and systems are needed that utilizes biometric devices to provide effective authentication to training and education organizations engaged in training over a networked environment while not decreasing the productivity a network provides to service providers (enterprise) and customers (end users/trainees).



Referring to FIG. **10**, the present invention overcomes limitations that are typically encountered in online/remote training systems. With the present invention, user authentication protection is used in a networked training environment. The present invention can allow for the following benefits: (1) flexibility to use the right biometric measurement for a training environment; (2) allows trainee/user mobility; (3) flexibility in the degree of authentication required to protect the integrity of educational/training resources; (4) allows remote enrollment of trainees/users; (5) allows remote refreshing of trainee/user biometric templates; and (6) ensures the integrity of training materials (e.g., courses) and test results submitted for courses taken by trainees using remote computers over communication networks.

Training Multimedia Example

Continuing Legal Education (CLE) has been successfully provided to legal professional using wired network communication over the Internet. LawyersLearn.com Inc. (www.lawyerslearn.com) has provided CLE to attorneys nationwide via website connections. The present inventor has described systems and methods for providing/executing training to/over/form hand held devices. The following training multimedia is now described as an example of material that can be provided as training media for viewing and use over hand held devices in accordance with preferred embodiments of the present invention.

Referring to FIG. **11**, the homepage of LawyersLearn.com is illustrated. As can be seen from the homepage, a user is immediately introduced to new course offerings with an introductory message **1107** (e.g., "New online Course:"). The user also has the ability to choose from six categories on the homepage: About user **1101**, Help/Tutorial **1102**, Student lounge **1103**, Course Catalog **1104**, State CLE requirements **1105** and Faculty **1106**. The State CLE Requirements **1105** tab can provide a summary of Minimum continuing legal education (MCLE) requirements for all fifty states and Territories of the United States.

Referring to FIG. **12**, the About Us **1101** tab of FIG. **11** takes the user to the illustrated page. An additional tab option, Home **1201**, can be provided on this and subsequent pages to get the user back to the LawyersLearn.com homepage (FIG. **11**). On this page, LawyersLearn.com Inc. is described to new and returning users. The user is also extended the option of downloading a detailed brochure **1202** on items such as company history, services, membership requirement, etc. Also provided as button options to the user are: "Our Company" **1203**, "Our Officers & board" **1204**; "Investor Relations:"**1205**; "Become an alliance Member" **1206**; "Become a Course Author" **1207**; and Contact Us" **1208**.

Tab **1206** (become an alliance member) can explore how State Bars and other legal associations can participate in promoting CLE to their constituents and in turn receive a share of profits derived from their membership. Referring to FIG. **13**, information on the Alliance Member program is provided. Technically, the LawyersLearn.com information technology infrastructure can keep track electronically of courses purchased by alliance membership in order to determine any fee sharing arrangement. The LawyersLearn.com system can also set up a unique web page for alliance members that operates to promote the alliance member organization on the from end (user or client perspective) but is managed electronically at the backend through the Law-

yersLearn.com system. For Example, LawyersLearn.com can set up a website that appears to be the general website or CLE portion of the "State Bar of State X", but all transactions related to training are managed and accounted for by LawyersLearn.com's enterprise system.

Referring again to FIG. **12**, Tab **1207** (become a course author) provides information to legal professional on how to author course on subject matter for provision to LawyersLearn.com users. The information in Tab **1207** explains that a course can be submitted and, if approved, may be provided through the LawyersLearn.com website to participating users. A percentage of fees generated from sales of the author's course can be paid as a royalty to the author.

Referring to FIG. **14**A, the "Help/Tutorial" page (Tab **1101**, FIG. **11**) of the LawyersLearn.com website is shown. The user is able to select HTML portions of this web page: "Let's Begin!" **1401**; "your Course" **1402**; "Registration!" **1403**; "Take A Course Tour!" **1404**; "How Do I . . . ?" **1405** and "Miscellaneous Stuff" **1406**.

The "Let's Begin" tab **1401** if selected provides a brief overview of the course and how to begin. The Text of tab **1401** is shown in FIG. **15**.

The "Your Course" tab **1402** if selected provides information on how courses work, navigation information, etc. The text of tab **1402** is shown in FIG. **16**. FIG. **16** refers to user-friendly navigational buttons **1601** (hypertext link). The hypertext "Ask The Mentor" **1602** of FIG. **16** if selected can allow a student to enter their name, email address and a question or comment that is delivered via email to the course author.

Referring back to FIG. **14**A, the "Take A Course Tour!" **1404** if selected can provide a tour of a typical course on LawyersLearn.com. The "Registration!" tab **1403** if selected can provides how to register for courses. The text of this tab is shown in FIG. **17**.

Referring to FIG. **18**, an overview of the navigational buttons **1801** if provided to the user. The buttons **1801** ("YES", "NO", "MAYBE", "BACK" and "NEXT") are self explanatory in FIG. **18**. Also explained to the user is that a course may be re-started if the user must log-out of the system, but does not want to lose his or her efforts. A user must log into the system when a course is initially started. Logging in to the system can require that a user have a registered LOGIN Name and password. A LOGON Name is generally accompanied by providing the account name used to gain access to a computer system. It can also be the act of entering into a computer system when the user computer is automatically recognized (e.g., via cookies, IP address).

A password is a code used by an authorized user to gain access to a locked computer system or program. Good passwords contain both alpha and numeric characters. Passwords are usually case (upper or lower) sensitive. Either or both the LOGON Name and Password can be replaced by biometric authentication technology (is described in detail above, FIG. **10**). But if a course is terminated without completion, the cookies on the users computer will remember where the user was in the course and allow the user to re-enter or rejoin **1802** the training. The most common meaning of "Cookie" on the Internet refers to a piece of information sent by a Web Server to a Web Browser that the Browser software is expected to save and to send back to the Server whenever the browser makes additional requests from the Server. Depending on the type of Cookie used, and the Browser's settings, the Browser may accept or not accept the Cookie, and may save the Cookie for either a short time or a long time. Cookies might contain information such as login or registration information, online "shopping cart" information, user preferences, etc. When a Server receives a request from a Browser that includes a Cookie, the Server is able to use the information stored in the Cookie.

Also shown in FIG. **18** is an icon of a judge **1803**. The judge **1803** ca be shown throughout a course after an answer to a question is properly or improperly rendered by the user. The example on FIG. **18** shows that the answer was correct.

Referring to FIG. **19**, shown is text **1902** used when an answer is incorrect **1901**. Also shown in FIG. **19** is text describing that case law relevant to a question can be hyperlinked for the user' convenience. Also discussed at FIG. **19** is that a Post Test can be provided at the end of a course. A user can seek assistance at different point throughout a course by clicking on the "contact support staff" button **1905**. The student can enter their name, email address and question/comment that will then be delivered via email to customer service.

Referring to FIG. **20**, text from what currently represents the first page of the course tour is shown. A course introduction **2001** is provided on the first page of every course. Navigational button "NEXT" **2002** is also shown.

Referring to FIG. **21**, a sample scenario **2101** is shown to the user. Also provided are BACK **2102** and NEXT **2103** navigational buttons. An overview **2104** of how to use navigational button is also provided for a user's recall.

Referring to FIG. **22**, a sample Query **2201** is provided to the user that is typically based on the previous scenario (FIG. **2100**). Answer buttons "NO" **2202** "YES" **2203** and navigational button "BACK" **2204** is also provided. The user can go "BACK" **2203** if the scenario need to be reviewed prior to answering the query **2201**. More information on the rule (e.g., 5th Amendment) can also be provided through a hypertext link **2405**. In the this case the user would click on the rule **2405** and can be provided a HTML window that provides the text for the rule as shown in FIG. **23**.

Referring to FIG. **24**, once the Query is answered the judge **2401** will let the user no if he/she is right or wrong. The judge can also elaborate on why (rationale) the answer was right or wrong, or allow the user to access (hypertext) supporting case law or rules). The user can use the navigational buttons to go BACK **2402** or move on to the NEXT **2403** scenario.

FIG. **25** shows a screenshot for the end of the tour. Also shown on this screen shot is a Grid **2501** that can be provided to show the user his or her status within a course (e.g., course completion status). The meter can show percentage complete or number of questions remaining, or other measurements that in the art that have or can be developed.

FIG. **26** shows the text for the final page of the Tour when final instructions can be given to the remote user, and a link to technical support staff can be provided.

Referring again to FIG. **14**A, the "How Do I . . . ?" **1405** portion of the web page (illustrated screen shot) allows the user to click on hypertext located beneath the category as follows: "Book Mark A Page" **1411**, "Contact Course Authors" **1412**, Contact Technical Support" **1413**, and Download Course Materials" **1414**. These categories are believed to be self explanatory to those skilled in the art. A user can book mark **1411** their place in a course if necessary. It may not necessary to bookmark your course page if the user's browser is set to accept cookies, he/she can return to the last course page visited by clicking on the "Welcome Back" button on the Home Page. If the user wishes to bookmark either a course page for easy return, or to set this site as the user's home page, the user can click on a browser type for further instruction from the browser software.

The study materials within a course can be made available for download, rather than streamed, so that they can be reviewed off-line. To download programs and documents, it is well known by those skilled in the art that a user can follow simple step-by-step instructions to complete document downloads. Files can be created as Portable Document Files (PDF) using "Adobe Acrobat", and zipped with "WinZip" to minimize the download time. A user must generally have supporting programs installed on your computer before a document or file can be downloaded or opened. For information on those programs, and/or to download the program(s) free, a user typically can click on the individual program icons on a Course Help page **1423**, shown at FIG. **14**B. From a course listing, such as shown in FIG. **30** (which is described in more detail later), a user can select the hypertext associated with a course, where a download window such as shown in FIG. **14**B will later appear, which can allow a user to download a course and/or materials. FIG. **14**B shows a "Download Course materials" screen shot with a button icon **1421** that can allows a user the choice of downloading a course. The user can also select a button **1422** to download course opinions. A user can also select a hyperlink **1423** to "visit our Course Help Page." It should be appreciated that a user can download either or both of the materials available on the download page. The download process can be repeated for each, or several, selections.

Once selections are made, a Window™-based "FILE DOWNLOAD" window, well known in the art, will open. The user can select "Save this file to disk" and click "OK". A Windows™-based "SAVE AS" window, also well known in the art, will then open prompting the user for the location on his/her computer's hard drive to save the file. The user can generally save files to a place the user can easily remember and access. Once the user has selected a location, the user can press the "SAVE" button on the SAVE AS window. Once the user has successfully downloaded the file(s), the user can double-click on the file to initiate the "unzip" process (follow unzip program instructions) and unzip the files. Once unzipped, a user will typically select (e.g., double-click) the file and it should automatically open utilizing, for example, the Adobe Acrobat™ Reader program.

Referring to the "Miscellaneous Stuff" **1406** area of the screen shot represented by FIG. **14**A, the user is able to obtain software support that can be useful with services provided by LawyersLearn.com, and is also self-explanatory.

Referring to FIG. **27**, shown is the "Student Lounge" page referred to as Tab **1403** of FIG. **14**. The student lounge allows user to connect to a chat room format of discussion with other student and legal scholars that may also be online with the legal training service provider. As shown in the figure, a user can select to connect to the chat room via FAST **2701** (e.g., ISDN) connection speed, or at a SLOW **2702** connection speed (e.g., 56 k modem). Once the student user as selected a connect speed, the user is directed to a login page where the student is asked to provide a name for identification during the chat session, as shown in FIG. **28**.

Referring to FIG. **29**, general categories of course offerings are shown on the "Course Register/Catalog" page of the website (FIG. **14**A, button **1404**). Here a user is able to select courses based on different categories such as "General Law" **2901**, "Recently Posted" **2902**, and "State Specific" **2903**. We can assume that the user is interested in "General Law" **2901** selections and therefore clicked or tapped on the hypertext associated with the category. The user is then taken to another page, shown at FIG. **30**, where a more detailed listing of courses is provided for the user to select from.

Referring to FIG. **31**, (associated with button **1406** of FIG. **14**A) a listing of faculty (trainers, coaches, or the like) is provided for the user's review. A user may be interested in seeing more information on, for example, James Moore **3101**. The user may select the hypertext or button associated with "James Moore" and be taken into Mr. Moore's detailed information as shown in FIG. **32**. In FIG. **32**, the user is provided with a bio **3201** on the instructor. The User can also select an audio interview (audio file) of Mr. Moore by selecting the Audio Interview button **3202**. Optionally, additional photographs can be provided. The user can exit the biography page by clicking on the "Close Window" button **3204**.

As can be seen from the foregoing discussion, training for all fields and professions has found it way through networks. Although most training has previously focused on a "wired" or physically "connected" environment, the following discussion illustrates how the present inventor has taken the online training environment to a level of mobility not presently enjoyed by users of electronic training environments.

Wireless Training

The previous discussion of FIGS. **10**–**32** has shown how a connected or "wired" presence can enhance the life of a legal professional required to engage in continuing legal education. The present inventor has now taken training as exemplified through the previously described multimedia examples into a format that can be provided to and utilized by a mobile trainee through a system that can utilize wireless communications and technologies.

Referring to FIG. **33**, a screen shot for LawyersLearn.com's downloadable software channel for a service provider well known in the art as "AvantGo" is illustrated. Although AvantGO™ can be used for what will be described in the following textual description, it should be appreciated that a direct connection to a private enterprise server can also be used to obtain training capabilities in accordance with the overall teachings herein. AvantGo is but one convenient means to use the present invention and is well known by mainstream hand held device users. AvantGo is a trade name of AvantGo, Inc.

A user that wishes to utilize wireless training will typically download software needed to enable their handheld device to communicate with the training provider enterprise's equipment at a webpage similar to that shown in FIG. **33**. The user click/selects downloadable software **3301** at or through the service provider website. Once the software is downloaded, the user can select courses from the training provider. In FIG. **33** two courses are shown to be available to the user, "Evidence/Hearsay 101" **3302** and "Ethics of Corporate Representation" **3303**. The user selects the hypertext for the course of interest.

A handheld device user can be required to log into the enterprise server in order to retrieve the course. In FIG. **34**, the user is asked for a Username **3401** and Password **3402**. Once Submitted **3403**, the user is taken to a training course download page. The web page shown in FIG. **35** is again associated with AvantGO, but it should be appreciated that proprietary systems can be provided for user access as described and shown in FIGS. **10**–**32**.

FIG. **35** illustrates that a user has been identified **3502** "Welcome lortiz" and is being provided with the option to synchronize his handheld with the website server to obtain

new materials or refresh old materials/channels **3501**. In the example of FIG. **35**, it can be seen the user "lortiz" has selected CLE2GO entitled "Evidence" for downloading to the handheld device. The user selects the "download button" **3302** to carry out the order.

Once the download of the course is completed, the user can be shown another screen, FIG. **36**, where the order for "Evidence" **3601** is confirmed. With AvantGo, the user is also able to manage other content **3602** taken into the handheld device. The user can check an item that the user wishes to delete, and can then cause the selection to be deleted **3603**. It should be appreciated that a similar content management method can be used for a proprietary training enterprise system to manage the addition and deletion of courses and associated training content. It should also be appreciated that courses can be downloaded to a handheld device directly from a wireless network connection using a micro browser, or downloading can be carried out using a synchronization routine and cradle tied to a PC. Such methods and hardware have been well described in FIGS. **1**-**5**.

Once a user has downloaded a course, the user can begin a course. The user or "trainee" can select the course from a dedicated training file stored in the handheld (e.g., "LawyersLearn.com CLE2GO"). The training course is selected by using the handheld GUI, typically a touch sensitive screen.

Once the user selects the course on the handheld wireless device, the user may be greeted by text such as: "You are about to participate in the latest technological advancement in Continuing Legal Education. This course, designed for palm-style applications and computers, has been created specifically with the hectic schedule of today's practicing attorneys in mind. Now CLE requirements can, be achieved virtually anywhere and at any time. Once you have completed the course, re-sync you palm-style device and your course information and post-test will be transferred to our database automatically. You will receive a course completion certificate via email within 48 hours. Thank you again for allowing us to be your source for CLE!"

A course can proceed similarly to the detailed description of FIGS. **15**-**26**. The electronic handheld course can provide the user with automatic breaks at the 25%, 50% and 75% levels of completion for a one-hour course. When provided a break, the user may be greeted by text like the following: "'You Deserve a Break'. You have completed [25%/50%/75%] of the course. Stand up! Stretch you legs, and grab something cold to drink before we move on. When you're ready to continue, click on the "next" button. If you wish to log off and complete the course at a more convenient tie, no problem! The training software makes it a snap. If you close your program down and log off, once you re-enter you will automatically be returned to this page where you can click the "next" link below to continue your course."

During a wireless handheld course, the user can be provided with scenarios (e.g., text, or streaming video vignettes). Streaming video can utilize the support of an active connection to the server in order to retrieve video files, assuming the handheld device lack sufficient memory. The user can be asked questions during and after the course. During the course, a judge can provides a ruling (correct/incorrect) for the answer provided by the user. The judge can also provide support for the ruling (e.g., legal rules, case law, reference manuals, etc.). For legal CLE as an example, the judge can provide rules of law, provides another scenario, asks questions of the user, provides additional ruling, and/or provides further rational through case law.



At completion of the handheld wireless course the user may be present with the following text: "You are almost finished. There are two more things we request that you do in order to help us evaluate the course and to make sure you receive credit for you participation. First is a quick post test consisting of 10 questions. Even though you will not be passed or failed based on your answers, give this a good shot. Keep in mind that a simple "true"/"False" answer may not cover the actual depth of the subject matter in all situations, based upon the course materials each question has a logical and legal basis. Finally, in order to receive credit, please fill out and submit the Evaluation and Certificate of Attendance also on this page."

The user can proceed by selecting the <NEXT> button on the screen. The user is then presented with post test questions. The questions can be provided as true/false, multiple choice, or write in answers. If True/False or multiple guess applies, then the user may select the appropriate radial dial button or hypertext associated with the perceived right answer. Course evaluations can be provided where the user can select a range (e.g., drop down buttons rating from 1-7, 7 being the highest). The Evaluation can also seek write-in comments.

Additional information can be requested at the end of a course for a user to get certified, or for a certificate to be completed for the user. The user can be asked for information as follows:

Certificate of Attendance

Last Name: ______

First name: ______

BPR or Professional License #: ______

E-Mail: ______

Please check the boxes below:

[] I have taken the entire Ethics of Corporate Representation 101 online seminar

[] Please Credit me with 1.0 CLE Hour for this online seminar

[] I certify the foregoing to be complete and accurate

[] You have my permission to share my above comments (in whole or in part) with others.

The user can then submit the information, post test and/or evaluation by selecting a button, for example "[SUBMIT POST TEST]."

The post test can be submitted immediately where a wireless connection is used, during the next wireless communication session, or during the next synchronization with a PC if the handheld device does not have wireless communication capabilities. Once the training provider receives the course completion information, recording, certification and/or reporting activities, among other processing, can be carried out.

The embodiments and examples set forth herein are presented in order to best explain the present invention and its practical application and to thereby enable those skilled in the art to make and utilize the invention. However, those skilled in the art will recognize that the foregoing description and examples have been presented for the purpose of illustration and example only. The description as set forth is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible in light of the above teaching without departing from the spirit and scope of the following claims.

What is claimed is:

1. A method of managing training completed remotely at a hand held device, said method comprising the step of:

receiving at a training server training data transmitted to the training server through a data network from a user of a hand held device, the training data representing training taken by the user at hand held device;

receiving identifying information for the user of a hand held device concurrently with the training data file;

identifying the user of the hand held device;

authenticating the identify of the user of the hand held device by requesting authentication data from the user and comparing the authentication data with a master user identification template containing authentication data associated with the user and accessible by the training server to determine if said comparison authenticates the user's identify as an authorized trainee;

recording the training data in memory associated with the training server;

locating at least one training file contained within the training data;

determining status of the training file by comparing the training file with an associated master training template accessible from memory by the training server, the status including a determination if training represented by the training file meets a set criterion including at least one of: pending, incomplete, failed, passed; and

recording training status in memory.

2. The method of claim **1** wherein the authentication data includes at least one of: a username, at least one password, at least one biometric template.

3. The method of claim **2** wherein said step of authenticating the identify of the user includes comparing the biometric template with a master biometric template associated with the user.

4. The method of claim **1** further comprising the step of providing training status from the training server to at least one of: the user, or at least one third party associated with the user.

5. The method of claim **1**, further including the step of certifying that training taken by the user of the hand held device is complete by providing notice to at least one of: the user, or a third party associated with the user.

6. The method of claim **5**, wherein the notice is provided in the form of at least one of: electronic mail automatically generated by the training server; a printable letter automatically generated by training server, a printable certificate automatically generated by the training server; a facsimile automatically generated by the training server.

7. A method for managing training completed remotely at a hand held device, said method comprising the step of:

receiving at a training server training data transmitted to the training server through a data network from a user of a hand held device, the training data representing training taken by the user at a hand held device;

receiving user identifying information for the user of a hand held device, the user information received concurrently with the training data file;

identifying the user of the hand held device;

authenticating the identify of the user of the hand held device by requesting authentication data from the user and comparing the authentication data with a master user identification template containing authentication data associated with the user and accessible by the training server to determine if said comparison authenticates the user's identity as an authorized trainee;

recording the training data in a memory associated with the training server;

locating at least one training file contained within the training data;

determining status of the training file by comparing the training file with an associated master training template accessible from memory by the training server, the status including a determination if training represented by the training file meets a set criterion including at least one of: pending, incomplete, completed, failed, passed; and

recording training status in memory.

8. The method of claim **7** wherein the authentication data includes at least one of: a username, at least one password, at least one biometric template.

9. The method of claim **8** wherein said step of authenticating the identity of the user includes comparing the biometric template with a master biometric template associated with the user.

10. The method of claim **7** further comprising the step of providing training status from the training server to at least one of: the user, or at least one third party associated with the user.

11. The method of claim **7**, further including the step of certifying that training taken by the user of the hand held device is complete by providing notice to at least one of: the user, or a third party associated with the user.

12. The method of claim **11**, wherein the notice is provided in the form of at least one of: electronic mail automatically generated by the training server; a printable letter automatically generated by the training server, a printable certificate automatically generated by the training server; a facsimile automatically generated by the training server.

13. A system for managing training completed remotely at a hand held device, said system comprising:

a training server, said training server adapted for receiving and processing training data transmitted from a user of a hand held device through an electronic data network from a hand held device, wherein said training server can locate at least one training file contained within the training data, determine the status of the training file by comparing the training file with an associated master training template stored in and accessible from memory by said training server, the status including a determination if training represented by the training file meets training criterion including at least one of: pending, incomplete, completed, failed, passed, said training server further adapted to receive identifying information for users of hand held devices and to authenticate the identify of users of the hand held devices, wherein said training server can request authentication data from users, compare the authentication data with a master user identification templates stored in said memory and containing authentication data associated with users, and determine if a user's identify compares with a master user identification template;

electronic data network communication hardware, said electronic data network communication hardware providing said server access to electronic data networks; and

memory accessible by said training server, said memory for recording training data, at least one training file, at least one master training template, training criterion, and training status.

**14**. The system of claim **13**, said training server adapted to receive and process authentication data including at least one of: a username, at least one password, at least one biometric template.

**15**. The system of claim **14**, said training server further adapted to authenticating the identity of users by comparing biometric samples provided by users with master biometric templates associated with authorized users.

**16**. The system of claim **13**, said training server further adapted to providing training status to at least one of: a training server user, or at least one third party associated with the training user.

**17**. The system of claim **13**, said training server further adapted to certify that training taken by users has been completed by electronically providing notice to at least one of: the user, or a third party associated with the user.

**18**. The system of claim **17**, wherein the notice is provided in the form of at least one of: electronic mail automatically generated by said training server; a printable letter automatically generated by said training server, a printable certificate automatically generated by said training server; a facsimile automatically generated by said training server.

* * * * *